221 N.J. Super. 466 (1987)
535 A.2d 1
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
ALLEN BASS, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued June 2, 1987.
Decided September 22, 1987.
*470 Before Judges MICHELS, O'BRIEN and SKILLMAN.
Michele A. Adubato, Designated Counsel, argued the cause for appellant (Alfred A. Slocum, Public Defender of New Jersey, attorney; Michele A. Adubato, of counsel and on the brief).
Janet Berberian, Assistant Prosecutor, argued the cause for respondent (George L. Schneider, Essex County Prosecutor, attorney; Janet Berberian, of counsel and on the brief).
The opinion of the court was delivered by O'BRIEN, J.A.D.
Defendant appeals from his conviction of aggravated manslaughter (N.J.S.A. 2C:11-4a),[1] upon which he was sentenced to a term of 20 years with a ten-year period of parole ineligibility, and third degree endangering the welfare of a child (N.J.S.A. 2C:24-4a), upon which he was sentenced to a concurrent term of five years with a two and one-half year period of parole ineligibility. A penalty of $1,025 payable to the Violent Crimes Compensation Board was also imposed. We affirm.
Defendant is 25 years of age. He met codefendant Renee Nicely (Nicely) when they were both about 14 years of age. Although unmarried, they had an ongoing relationship which produced five children. Their first child, Davell, was born in *471 December 1977, and their second, Shawn, was born on February 19, 1979.[2] On September 26, 1982, Shawn was brutally beaten to death. Defendant and Nicely[3] were charged with his murder. In addition, defendant was charged with having, on or about September 26, 1982, caused Shawn harm that would make him an abused or neglected child, defendant having a legal duty to care for him (N.J.S.A. 2C:24-4a).
Testimony at the joint trial of defendant and Nicely revealed a variety of acts of mistreatment of Shawn by Nicely. During a period when Nicely and her two children were residing with defendant's mother, Nicely conceived the idea, upon the suggestion of defendant's mother, that Shawn was not her child. It was suggested that the wrong child had been delivered to her by the Division of Youth & Family Services (DYFS). There was substantial testimony from friends and neighbors that Nicely abused Shawn and had a conception that she could treat him as she saw fit. However, the friends and neighbors also indicated that, before the murder, defendant treated Shawn as he did the other children and was not cruel or abusive to him. One exception was testimony[4] that defendant burned Shawn on his buttocks sometime between April and July 1982. In addition, Davell testified that defendant killed his brother. He said:
He (defendant) took him (Shawn) by his hand and jumped on him and then stepped on his back with 2 feet. He took one foot then put his other foot, stepped on him.
Davell also testified that defendant punched Shawn in the eye and "then he throwed him in the tub with full of water trying to drown him." Davell further testified that defendant had *472 injured Shawn on a prior occasion when pushing him through a door on "a little horsey" with wheels. Furthermore, according to Davell, defendant got Shawn drunk on occasions by giving him liquor and beer.
On the day of his death, Shawn was beaten unmercifully. The extensive injuries which he suffered were testified to by the medical examiner and included subcutaneous hemorrhage on the back of the head, hemorrhage on both sides of the head, ecchymosis of the left eye, lacerations and cuts involving both ears and subcutaneous hemorrhage involving the chin. Shawn's brain was swollen as a result of concussion. There was hemorrhage on both sides of his buttocks, recent injuries of his left shoulder and left upper back, right middle back, lesions of the exterior chest, left shoulder, middle area of the chest, right upper chest, abrasions of the right side of the abdomen, bruise of the anterior portion of the left thigh, contusion and abrasion of the left genital, three burn marks on the chest and a burn mark on the left shoulder. He had sustained a painful fracture of the distal end of the elbow, between six days and 24 hours before his death. There were many internal injuries, as well as a recent fracture of the eighth rib. Due to the substantial number of injuries Shawn sustained, it was impossible to accurately pinpoint the particular blow that caused his death. The medical examiner described it as a homicide by assault.
After defendant's indictment on December 20, 1982, a number of proceedings were conducted by the trial judge, productive of an extensive record.[5] It is only necessary for us to refer to those proceedings involving the issues raised on this appeal, which are as follows:

*473 POINT I THE DEFENDANT'S MOTION TO PROHIBIT DEATH QUALIFICATION OF PROSPECTIVE JURORS AS VIOLATIVE OF THE CONSTITUTION SHOULD HAVE BEEN GRANTED BY THE COURT.
POINT II THE DEFENDANT'S MOTION FOR SEVERANCE SHOULD HAVE BEEN GRANTED BY THE COURT.
POINT III THE ADMISSION OF THE TESTIMONY OF A WITNESS TAKEN OUTSIDE THE PRESENCE OF THE DEFENDANT AND THE JURY DENIED THE DEFENDANT HIS RIGHT OF CONFRONTATION.
POINT IV IT WAS ERROR FOR THE COURT TO ADMIT THE TESTIMONY OF DOLORES MORTON AND LYNNE LEIBERMAN PURSUANT TO EVID.R. 63(4).
POINT V THE TESTIMONY OF JANIE BENNETT SHOULD NOT HAVE BEEN ADMITTED INTO EVIDENCE.
POINT VI THE TESTIMONY OF PROSECUTOR DETECTIVES CONCERNING PRIOR STATEMENTS OF DAVELL NICELY SHOULD NOT HAVE BEEN ADMITTED INTO EVIDENCE.
POINT VII THE JURY CHARGE CONCERNING ACCOMPLICE LIABILITY AND OMISSION TO ACT WAS ERRONEOUS.
POINT VIII THE DEFENDANT'S MOTIONS FOR JUDGMENT N.O.V. AND FOR A NEW TRIAL SHOULD HAVE BEEN GRANTED BY THE COURT.
POINT IX THE FAILURE OF THE COURT TO MERGE THE OFFENSES OF AGGRAVATED MANSLAUGHTER AND ENDANGERING THE WELFARE OF A CHILD AT SENTENCING WAS ERROR.
POINT X DEFENDANT WAS INDICTED, TRIED AND CONVICTED BY A GRAND AND PETIT JURY SYSTEM IN ESSEX COUNTY WHICH WAS UNREPRESENTATIVE IN VIOLATION OF THE FEDERAL AND STATE CONSTITUTIONS AND THE APPLICABLE NEW JERSEY STATUTES.
We address these issues separately.

A. COMPOSITION, DEATH QUALIFICATION AND SELECTION OF JURY
Initially, by order dated February 12, 1986, we suspended decision on the issues raised in Point I as to "death qualification" of prospective jurors and Point X concerning the alleged unrepresentative composition of juries in Essex County, pending resolution of those issues by the Supreme Court. However, by order of February 5, 1987, we vacated our order of February 12, 1986, and directed the State to file a responding brief as to those issues, which it has done.
*474 Among the pretrial motions filed by defendant was an application to have the court preclude "death qualification" of prospective jurors. In a written opinion, the trial judge denied defendant's motion. State v. Bass, 189 N.J. Super. 461 (Law Div. 1983). The issue has since been decided adversely to defendant's position by the New Jersey Supreme Court in State v. Ramseur, 106 N.J. 123, 248-261 (1987), see also Lockhart v. McCree, 476 U.S. 162, 163-65, 106 S.Ct. 1758, 1760, 90 L.Ed.2d 137, 142 (1986).
Defendant filed his notice of appeal on October 27, 1983. On his motion we remanded the case, by order dated August 8, 1984, for a ruling on his challenge to the jury composition. Defendant was one of 13 defendants who joined in Thomas Ramseur's motion challenging the jury selection system in Essex County. Defendant sought to reverse his conviction. After a lengthy evidentiary hearing, Judge Richard Newman denied the motions. State v. Ramseur, 197 N.J. Super. 565 (Law Div. 1984). Defendant's motion to the Supreme Court for direct certification to join in the appeal in State v. Ramseur on the sole issue of jury selection was denied by the Supreme Court on March 5, 1985.
The Law Division decision in Ramseur was affirmed by the Supreme Court on March 5, 1987. State v. Ramseur, 106 N.J. at 212-239. There is no merit to defendant's contention concerning excuses to students and teachers which were based largely on statutory requirements. The decision of the Supreme Court in State v. Ramseur is dispositive of Points I and X urged by defendant on this appeal.

B. SEVERANCE
Defendant's motion for severance from prejudicial joinder under R. 3:15-2(b) was denied. Such a motion is entrusted to the sound discretion of the trial judge. See State v. Scioscia, 200 N.J. Super. 28, 42 (App.Div. 1985), and the cases cited therein. We will not reverse the denial of such a motion *475 unless there is a clear showing of abuse of discretion. See State v. Moriarty, 133 N.J. Super. 563, 569 (App.Div. 1975), certif. den. 68 N.J. 172 (1975). Relying upon State v. Pickles, 46 N.J. 542 (1966), defendant contends that his incrimination of Nicely in order to exculpate himself caused the jury to react unfavorably to him. In addition, he contends that the substantial evidence of Nicely's repeated abusive conduct towards Shawn and the court's repeated admonition to the jury that such testimony could only be used against Nicely was prejudicial to him. Further, he contends the prejudice to him was greatly enhanced by Nicely's defense of diminished capacity, since the psychiatrists attributed much of her conduct to her isolation and despair which reflected unfavorably upon defendant. For this proposition he relies upon State v. Sinclair, 49 N.J. 525 (1967), where, although the Court found that the trial judge had not abused his discretion in denying a severance, it nonetheless concluded that on retrial justice would be better served by a severance, if requested by either defendant. Id. at 550. We have thoroughly reviewed defendant's contentions concerning the denial of his motion for severance in light of the applicable law and affirm the denial substantially for the reasons given by Judge Edwin H. Stern in his oral opinion of May 16, 1983.

C. CONFRONTATION
As noted, the victim's five year old brother, Davell, was an eyewitness to the murder. After hearing the testimony of a clinical psychologist who examined Davell at the request of the defense, and Davell's treating psychologist, the trial judge made findings based upon those opinions and concluded that the testimony of Davell should not be given in the presence of his parents, the defendant and Nicely. He further concluded that the jury need not, in all instances, physically observe the witness. Therefore, the trial judge held that a video observation is constitutionally adequate and there is no constitutional *476 right to face-to-face confrontation between the witness and the accused.
The procedure ultimately used was that Davell testified on closed circuit television in the judge's chambers, in the presence of his foster mother, the trial judge, counsel for defendant, and one of Nicely's attorneys. This live testimony was simultaneously transmitted audibly and visually to both the jury and defendants, with the camera focused on the witness. Defendant and Nicely, and Nicely's second attorney, were located in the chambers library with a two-way telephone communication system to secure the right of cross-examination. At the request of defendant, the jury was given the impression that defendants were physically present in chambers.
Defendant contends that this procedure violated his right to be confronted with the witness, as guaranteed by both the Sixth Amendment to the United States Constitution and Article 1, par. 10 of the New Jersey Constitution. We disagree, substantially for the reasons given by Judge Stern in his oral opinion of May 13, 1983.
At a pretrial competency hearing, Dr. Edward Arnow, a psychologist called by the defense, testified that it would be "disastrous" for Davell to testify in the presence of his parents. Dr. Walter Duryea, the treating psychologist, agreed that confronting his parents in court would have "a serious negative effect" on Davell, although he may be able to do it. Not only did the murder involve extensive physical abuse to Shawn, but the psychologist's testimony revealed substantial psychological trauma suffered by Davell in witnessing this tragic event. The trial judge's decision, based upon the opinion of the psychologists, was clearly warranted. To the extent that United States v. Benfield, 593 F.2d 815 (8th Cir.1979), and Herbert v. Superior Court of California, 172 Cal.Rptr 850, 117 Cal. App.3d 661 (Cal.Ct.App. 1981), relied upon by defendant, are inconsistent with our ruling, we disapprove of them in this jurisdiction.
We held recently that admission of an "unavailable" witness' videotaped deposition in a criminal trial did not violate defendant's *477 right of confrontation under the United States and New Jersey Constitutions. See State v. Washington, 202 N.J. Super. 187 (App.Div. 1985), where we said:
The right of an accused `to be confronted with the witnesses against him' is protected in New Jersey not only by the application of the Sixth Amendment to the United States Constitution to the States through the Fourteenth Amendment, but by a parroting of that language in the Constitution of New Jersey. N.J.Const. (1947), Art. I, par. 10. Distilled in the relatively recent case of Ohio v. Roberts, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), the purposes of the constitutional protection afforded by the confrontation clause are `a preference for face-to-face confrontation at trial' and a securing of the right of cross-examination. 448 U.S. at 63, 100 S.Ct. at 2537. At the outset we observe that the United States Supreme Court thereby distinguishes between the desirability, expressed in terms of `preference,' of face-to-face courtroom confrontation and the `secured' right of cross-examination. This alone suggests that the confrontation guaranteed by the clause is not necessarily one in a courtroom. But see California v. Green, 399 U.S. 149, 157-158, 90 S.Ct. 1930, 1934-1935, 26 L.Ed.2d 489 (1970). But the matter was not left to inference in Ohio v. Roberts. There it is expressly held that `competing interests, "if closely examined," [citation omitted], may warrant dispensing with confrontation at trial.' 448 U.S. at 64, 100 S.Ct. at 2538.
* * * * * * * *
... We hold there was no error in granting leave to take the deposition and no error, insofar as the confrontation clauses of the Constitutions of both the United States and New Jersey are concerned, in the admission of the deposition in evidence. A case bearing a remarkable similarity to the matter before us in the respect with which we are here concerned reached the same result. United States v. Tunnell, 667 F.2d 1182 (5 Cir.1982). [202 N.J. Super. at 191-193.]
We further note N.J.S.A. 2A:84A-32.4, adopted by the Laws of 1985, c. 126, § 1, effective April 11, 1985, authorizes a similar procedure to that used in this case in prosecutions for aggravated sexual assault, sexual assault, aggravated criminal sexual assault, criminal sexual contact, or child abuse, or in any action alleging an abused or neglected child. N.J.S.A. 9:6-8.21. We perceive no error in the procedure used for Davell's testimony at trial.

D. EVIDENTIAL RULINGS

(1) Testimony of Dolores Morton

Points IV, V and VI concern evidential rulings. The first deals with the testimony of Dolores Morton. Shawn had lived *478 with Mrs. Morton from May 1981 until April 1982 and a close relationship developed between them. Shawn returned to the Nicely household in April 1982 where Mrs. Morton visited with him occasionally. In July 1982, Mrs. Morton, her husband and a girlfriend, went to Paterson where Mr. Morton was going to repair Mrs. Morton's bible instructor's refrigerator. Nicely granted permission for Shawn to go with them. In Paterson while helping Shawn go to the toilet, Mrs. Morton observed "what appeared to be burns on his buttocks." In response to her question, "Shawn, tell Momma what happened to your heiney," Shawn replied, "Allah (defendant) burned me with the light Momma."[6] Not long after, Shawn climbed on to Mrs. Morton's lap. When she flicked a lighter to light a cigarette he asked her "to please not burn him with the lighter."
After a Rule 8 hearing, the trial judge ruled this testimony admissible as an exception to the hearsay rule under Evid.R. 63(4). He explained the reasons for his ruling as follows:
I do so because there was apparently a very close strong relationship with Ms. Morton on the one hand and Shawn Nicely on the other. Shawn remained in the Morton home for approximately 11 months, and that relationship was fostered and developed in that context.
Shawn had no such marks on him when returned to the Nicely home in April, and we're talking about a period of approximately three months or so. Ms. Morton did have an opportunity to talk to Shawn once between April and July, but it was in the Nicely home and there of course was no physical observations of the buttocks area or questions relating to the buttocks at that time and, in any event, it was in the hearing or proximity of Ms. Nicely and within her home. On Friday afternoon of last week, I cited the annotation concerning the declarant's age as affecting admissibility of a res gestae statement,.... I at that time cited a good number of cases indicating that the tender age of the declarant has been noted as a basis for relaxing traditional rules concerning contemporaneous statements. This because of the fact that children are less likely to employ reflective powers to fabricate. And it seems to me that under the circumstances, given the relationship between Ms. Morton and Shawn Nicely, their lack of opportunity to talk and any prior observations between *479 April, when Shawn was returned in good condition to the Nicely home, and in July, when the observations were made, that the exception to the hearsay rule under Evid.R. 63(4) is applicable, and I will allow admissibility of the statement.
Defendant claims that the admission of this testimony was error. He argues that it was highly prejudicial since it was the only evidence of his purported abuse of Shawn, whereas "all of the other evidence clearly demonstrated Mr. Bass loved and cared for Shawn."[7]
The State responds that the evidence was offered by it "under three different theories: (1) as an excited utterance pursuant to Evid.R. 63(4); (2) pursuant to the fresh complaint rule, and (3) to demonstrate the culpability or intent of defendant pursuant to Evid.R. 55." Clearly, the evidence was not admissible as a "fresh complaint." That rule is applied widely in rape and morals cases and permits proof that the violated victim complained within a reasonable time to someone he or she would ordinarily turn to for sympathy, protection and advice. State v. Balles, 47 N.J. 331, 338 (1966), cert. den. and appeal dismissed 388 U.S. 461, 87 S.Ct. 2120, 18 L.Ed.2d 1321 (1967). The rationale of that rule was explained in Balles as follows:
If no testimony were offered with respect to the complaint the jury might naturally assume that none was made and that it is only just that the prosecution be permitted to forestall this natural assumption by showing that a complaint was in fact made. Ibid.

In response to an objection that testimony of the fresh complaint was given before the testimony of the victim, the Balles court noted that the only significant question is whether in fact the complaining witness does give testimony at the trial. See Balles, supra at 340-341; see also State v. Hummel, 132 N.J. Super. 412, 422 (App.Div. 1975), certif. den. 67 N.J. 102 (1975). In this murder case the victim obviously did not testify. *480 Thus, the rationale for the admissibility of fresh complaint testimony is not present.
This testimony did constitute "other crimes evidence" to which the exception as to admissibility to prove some other fact in issue such as intent, or absence of mistake or accident may apply. However, such testimony may not be admitted if otherwise excludable as hearsay. It must be proven by direct evidence, not incompetent hearsay. See State v. Ingenito, 87 N.J. 204, 224 (1981) (Schreiber, J., concurring).
The only basis upon which this evidence could be properly admitted is Evid.R. 63(4) upon which the trial judge based his decision. The rule reads as follows:
A statement is admissible if it was made (a) while the declarant was perceiving an event or condition which the statement narrates, describes or explains, or (b) while the declarant was under the stress of a nervous excitement caused by such perception, in reasonable proximity to the event, and without opportunity to deliberate or fabricate.
From the evidence and the fact that the burns had healed, it is obvious that substantial time had elapsed between the alleged event (i.e., when defendant burned Shawn) and the statement by Shawn to Mrs. Morton as to how he received the burns. The trial judge recognized that the event occurred some time between April 1982, when Shawn was returned to the Nicely household without these marks, and July 1982, when they were observed by Mrs. Morton. The questions then presented are: (1) whether Shawn was still under the stress of a nervous excitement caused by perceiving the event, and (2) whether the statement was in reasonable proximity to the event such as to be without opportunity to deliberate or to fabricate. The trial judge, relying upon a series of out-of-state cases, recognized that "the tender age of the declarant has been noted as a basis for relaxing traditional rules concerning contemporaneous statements." However, as we noted in State in the Interest of C.A., 201 N.J. Super. 28, 33 (App.Div. 1985):
A court may make allowances for a child's youth and naivete in extending the time during which the nervous excitement continues to enhance the reliability of the statement. State v. Padilla, 110 Wis.2d 414, 417, 329 N.W.2d 263, 266 *481 (Wis. Ct. App. 1982). A child's youth and naivete, however, are not substitutes for the stress of a nervous excitement, which is the basis for the hearsay exception.
We have recently expanded the hearsay exceptions contained in our Rules of Evidence to include a "naivete" or "tender years" exception in sexual abuse cases when a child relates events of the abuse to a parent, health professional, or other confidant.[8]State v. D.R., 214 N.J. Super. 278 (App.Div. 1986), certif. granted 107 N.J. 104 (March 3, 1987). We there noted that in N.J.S.A. 9:6-8.46a, the Legislature enacted an evidential rule for application in proceedings for the termination of parental rights. In such hearings:
... previous statements made by the child relating to any allegations of abuse or neglect shall be admissible in evidence; provided, however, that no such statement, if uncorroborated, shall be sufficient to make a fact finding of abuse or neglect.
We conclude that in this case the evidence was properly admitted under Evid.R. 63(4), as enhanced by a specific tender years or naivete concept. Although the sequence of the two events testified to by Mrs. Morton are reversed, it is evident that Shawn's reaction when she took out her cigarette lighter preparatory to lighting a cigarette was an excited utterance while Shawn was perceiving the event. Such a reaction demonstrated that the stress of the nervous excitement of being burned by defendant previously was still present in the mind of this three and one-half year old child when he made the statement, "Allah burned me with the light Momma." By itself, testimony as to Shawn's reaction when Mrs. Morton took out her lighter would be irrelevant, except that it was tied in to defendant through Shawn's answer when Mrs. Morton asked him how he got the burn marks on his "heiney." Shawn's *482 reaction to the lighter and his statement to Mrs. Morton were in close proximity to each other and reflect continuance of the stress of nervous excitement sufficient to enhance the reliability of Shawn's statement.
Furthermore, we conclude that, even if the statement was improperly admitted, it was harmless error in view of Davell's testimony as to defendant's conduct towards Shawn, both before and on the day of his death. R. 2:10-2; see State v. Macon, 57 N.J. 325, 337-338 (1971). We recognize that, as between defendant and Nicely, testimony from the other witnesses revealed that Nicely substantially abused Shawn, but that defendant was pictured as treating Shawn with love and affection. Mrs. Morton testified that, although Nicely did not visit Shawn while he was living with her, defendant did visit and displayed affection to, and received affection from, Shawn. Defendant even brought him a present at Christmas. Nevertheless, we cannot conceive that any error in admitting this testimony was so prejudicial as to bring about an unjust result. By their verdict, the jury appears to have clearly recognized the difference in the way Shawn was treated by Nicely as opposed to his treatment by defendant. Furthermore, the testimony was admitted as going to defendant's intent, i.e., that he acted purposely or knowingly, whereas he was convicted of aggravated manslaughter, i.e., acting recklessly. The trial judge specifically told the jury that the evidence was admitted only as it related to defendant's conduct on September 26, 1982.

(2) Testimony of Lynn Lieberman

The second evidential ruling about which defendant complains concerns the admission of the testimony of Lynn Leiberman, a casework supervisor for DYFS, who first saw Davell on the day of the murder at approximately 11:30 a.m. His demeanor at that time was described as quiet and withdrawn. Subsequently, when Davell and the other children were brought to the hospital, upon entering the lobby, Davell stiffened, *483 backed into the windows and would not move, as he was "really terrified." When Ms. Leiberman attempted to persuade him to go into the emergency room, she asked Davell if he was afraid that the same thing would happen to him. He shook his head and said "and, anyway, Allen walked on Shawn's back." The trial judge admitted this testimony under Evid.R. 63(4) as a spontaneous and contemporaneous statement. Noting that the interval from perception to declaration was approximately six hours, he found:
Under the circumstances, I have no doubt by any standard or any burden of proof that Davell Nicely was under nervous excitement as a result of what he perceived approximately six hours earlier and that the stress caused by his perception or the nervous excitement caused by the perception continued until the time he made the declaration, including the declaration concerning being asleep, and that he had no opportunity to deliberate or fabricate, and, therefore, I will allow the statement to be introduced as an exception to the hearsay rule and, therefore, substantively.
We agree. This statement by Davell was truly spontaneous and made solely under the stress of the nervous excitement of having observed his younger brother brutally beaten to death.

(3) Testimony of Janie Bennett

The next evidential ruling about which defendant complains is the admission of testimony by Janie Bennett, a neighbor, as to statements made by defendant approximately two to two and one-half years before trial. At a Rule 8 hearing, the witness testified as follows:
A. I asked Allen (defendant) why would he allow Renee (Nicely) to treat Shawn like that, and he said she can do what she want to do.
Q. Now, did you ask at that time either Renee or Allen if you could do anything with Shawn?
A. I asked them if I could have him.
Q. And who did you ask that of?
A. I asked Renee, and I also asked Allen, and he said it's up to Renee.
Before the jury, the witness testified as follows:
A. I asked  I had asked Renee about letting me have Shawn and I  Allen come and I asked Allen why do you let Renee do that to Shawn, and he said  he said Renee do what she want to do.

*484 Q. And did you ask Renee Nicely at that time whether you could have Shawn, keep Shawn?
A. I asked both of them.
Q. What did she say?
A. Allen say something to Renee, and Renee say yes.
Defendant concedes that, on its face, the statement attributable to defendant is admissible under Evid.R. 63(7), but contends that the trial judge should have excluded it under Evid.R. 4. As one of the arguments in support of exclusion he contends that Ms. Bennett's testimony at the Rule 8 hearing was dissimilar to her testimony before the jury. He argues, "the use of the different words, vastly altered the meaning conveyed to listeners." We disagree with this factual contention by defendant. Moreover, we agree with Judge Stern that the evidence was not so remote as to require exclusion under Evid.R. 4.
Whether the probative value of evidence is outweighed by the potential for prejudice is a decision left to the discretion of the trial judge. See Stoelting v. Hauck 32 N.J. 87 (1960). The party seeking to preclude the admission of evidence must convince the court that the factors favoring exclusion substantially outweigh its probative value. Cf. State v. Sands, 76 N.J. 127 (1978) (whether prior convictions may be excluded as prejudicial). On appellate review, the decision of the trial court must stand unless it can be shown that the trial court palpably abused its discretion, that is, that its finding was so wide of the mark that a manifest denial of justice resulted. See State v. Rogers, 19 N.J. 218, 229 (1955); see State v. Carter, 91 N.J. 86, 106 (1982). We find no abuse of discretion in the admission of Janie Bennett's testimony.

(4) Prior Consistent Statements of Davell Nicely

The last evidential ruling complained of deals with the admission of prior statements made by Davell through testimony of prosecutor's detectives. Davell testified that his younger brother Shawn was killed when defendant stepped on his back and Nicely hit him across the head with a broom. Davell went *485 on to explain that defendant also punched Shawn in the eye and threw him in a tub of water. During cross-examination of Davell by defendant's attorney, the following testimony was elicited:
MR. GLAZER: Did you tell  Davell, did you tell the big guy with the beard [apparently referring to Investigator Gold] that only Renee hit Shawn?
D. NICELY: I forgot to tell  I forgot to tell them that Allen did it, too.
MR. GLAZER: Oh. When you forgot, did the detective help you remember that Allen hit him, too?
D. NICELY: Yeah.
MR. GLAZER: Did Mr. Monaco, the man here, Shawn  Davell, did he help you remember that Allen hit him, too?
D. NICELY: I don't know.
MR. GLAZER: But Mr. Gold did?
(Witness nodding.)
D. NICELY: He did. Because he told me that he forgot.
MR. GLAZER: Did you say to someone that one time that only Allen hit Shawn?
D. NICELY: Huh?
MR. GLAZER: Did you ever say that only Allen hit Shawn?
D. NICELY: I told the man what you had said.
MR. GLAZER: Did you say only Renee hit Shawn?
D. NICELY: I told the Gold that.
MR. GLAZER: You told the Gold only Renee hit Shawn?
D. NICELY: Because I forgot to tell him that Allen did it, too.
MR. GLAZER: When you saw  when they put you on television, Davell 
D. NICELY: I was on the television.
MR. GLAZER: Well, remember they had a camera? And you were talking to the black man (apparently referring to Investigator Thompson)? Who did you tell him hit Shawn?
D. NICELY: I didn't tell him nothing. I didn't tell him nothing.
MR. GLAZER: You didn't tell him anything?
(Witness shaking head.)
D. NICELY: Only told him and that  there's another man, another man, he got hair like you.
MR. GLAZER: Got hair like me? Nice?
D. NICELY: And he said  he said he might take me fishing.
MR. GLAZER: He might take you fishing? And, Davell, when you forget things about what happened at the apartment, did they help you remember? They do?
(Witness nodding.)
*486 It is clear that this cross-examination of Davell was an attack on his credibility and was calculated to imply that Davell fabricated his account of the murder of his brother pertaining to defendant at the urging of the prosecutor's investigators. In order to rebut this charge of recent fabrication, it was therefore proper for Detectives Gold and Thompson to testify regarding prior statements made to them by Davell under Evid. R. 20.
In State v. King, 115 N.J. Super. 140, 146 (App.Div. 1971), certif. den. 59 N.J. 268 (1971), we said:
A `charge' of recent fabrication can be effected through implication by the cross-examiner as well as by direct accusation of the witness. In fact that is the usual way in which the charge is made. For present purposes, it is the impression the cross-examiner makes upon the jury in the heat of the trial rather than what an appellate court would discern from a coldly analytical study of the testimony which must control review of the somewhat discretionary exercise of judgment made by the trial judge in the matter.
We find no merit to defendant's contentions concerning the various evidential rulings referred in Points IV, V and VI.

E. JURY CHARGE
Defendant contends in Point VII that the charge as to accomplice liability and omission to act were erroneous and deprived him of a fair trial. It is claimed that the charge on accomplice liability was erroneous in two areas: (1) "the court failed to charge that defendant must share a community of purpose for accomplice liability," and (2) "the court mistakenly charged the defendant had a duty imposed by law to prevent the homicidal act."
A shared intent is a prerequisite to accomplice liability under N.J.S.A. 2C:2-6(b)(3). See State v. White, 98 N.J. 122, 129 (1984). In State v. Fair, 45 N.J. 77, 95 (1965), the Court said:
To render both defendants guilty it is essential that they shared in the intent which is the crime's basic element, and at least indirectly participated in the commission of the criminal act....

*487 While each participant may be guilty `as a principal' N.J.S.A. 2A:85-14, he is not necessarily guilty in the same degree. If both parties enter into the commission of a crime with the same intent and purpose each is guilty to the same degree; but each may participate in the criminal act with a different intent. Each defendant may thus be guilty of a higher or lower degree of crime than the other, the degree of guilt depending entirely upon his own actions, intent and state of mind.
While defendant correctly states the necessity for a shared intent, he incorrectly contends that the jury was not so instructed. The trial judge charged the jury in part as follows:
In this case, it is unnecessary for you, the jury, to determine which defendant actually caused each of the injuries to Shawn Nicely. Rather, you must decide whether each of the defendants actively participated in the events leading to the death of Shawn Nicely. In the event that you are unable to determine which of the two defendants caused the death, but you are satisfied that it was one of the two and that both defendants actively participated in injuring or striking Shawn with a common purpose to cause him serious bodily injury or to kill him, then you must find both defendants guilty of murder by their own conduct. If you find that only one defendant so acted or actually caused the death, you may find the other guilty of murder as well if you find that he or she was an accomplice.
A person is guilty of an offense if it is committed by his own conduct or by the conduct of another for which he is legally accountable or both.
* * * * * * * *
A person is legally accountable for the conduct of another when he is an accomplice of such other person in the commission of an offense. A person is an accomplice of another person in the commission of an offense if for the purpose of promoting or facilitating the commission of the offense he aids or agrees or attempts to aid such other person in planning or committing it, or, if having a legal duty to prevent the commission of the offense, he fails to make a proper effort to do so.
I've already defined for you the term with purpose or purposely. An attempt to aid occurs when acting with the same type of culpability or state of mind required for the offense ... [Emphasis supplied.]
This charge was repeated in the context of manslaughter.
A reading of the charge clearly refutes defendant's contention. The trial judge's charge as to accomplice liability was in the language of N.J.S.A. 2C:2-6 and clearly enunciated the shared intent requirement. See e.g., State v. Hakim, 205 N.J. Super. 385, 387 n. 1 (App.Div. 1985). As recognized by the judge at the hearing on defendant's motion for a new trial, defendant has ignored the clear and plain language of the *488 charge as to accomplice liability. At that hearing, the judge pointed out:
What you find to be missing I believe was included in the charge at the outset with respect to accomplice liability, I think in the murder section and then restated and incorporated in the aggravated manslaughter section.
Next, defendant argues that the trial judge instructed the jury that if a defendant purposely did nothing to stop the other from beating the decedent, his inaction alone was sufficient to constitute culpability for murder or aggravated manslaughter. He contends the court never addressed the jury regarding the requirement of shared intent with the actual perpetrator. According to defendant, the judge informed the jury that purposely "doing nothing," without more, was sufficient for a finding of guilt of murder or aggravated manslaughter. An examination of the charge in its entirety, State v. Wilbely, 63 N.J. 420, 422 (1973), reveals the inaccuracy of defendant's contentions. As to omission to act, the trial judge charged the jury as follows:
Ladies and gentlemen, I also instruct you that if only one person committed the acts causing Shawn's death, the other can be deemed an accomplice to murder if you find that he or she was a natural parent or person having custody or control of the child or who otherwise assumed responsibility for him and that he or she purposely did nothing to stop the beating and did nothing with purpose or knowledge that the beatings by the other would result in Shawn's death or in serious bodily injury resulting in death.

Moreover, if you find that Renee Nicely caused Shawn's death but Allen Bass was a father or a person who assumed responsibility for Shawn with the purpose of [sic] knowing that the result would lead to his death or seriously [sic] bodily injury resulting in death, he must be found guilty of murder as an accomplice even if you find that Miss Nicely was not capable of forming the requisite state of mind or did not have the requisite intent to commit murder herself. [Emphasis supplied.]
Defendant contends that an omission to act cannot form the basis of a murder or manslaughter conviction. This argument is untenable. Initially, the trial judge observed that he included omissions because of the definition of "conduct" in N.J.S.A. 2C:1-14d which includes an omission, but that it must be coupled with the requisite state of mind. The judge also noted that the definition of a criminal attempt in N.J.S.A. *489 2C:5-1a(3) refers to purposely doing or omitting to do something. Moreover, a person is accountable as an accomplice if, having a legal duty to prevent the commission of an offense, he fails to make a proper effort so to do. N.J.S.A. 2C:2-6c(1)(c). Liability for the commission of an offense may not be based on an omission unaccompanied by action unless a duty to perform the omitted act is otherwise imposed by law. N.J.S.A. 2C:2-1b(2).
Notwithstanding defendant's argument to the contrary, we are satisfied that there was sufficient evidence in the record to infer that defendant was the father of Shawn,[9] or at least that on the fatal day he had assumed responsibility in part for the care of Shawn. N.J.S.A. 2C:24-4a provides:
Any person having a legal duty for the care of a child or who has assumed responsibility for the care of a child ... who causes the child harm that would make the child an abused or neglected child as defined in R.S. 9:6-1, R.S. 9:6-3 and [N.J.S.A.] 9:6-8.21 is guilty of a crime of the third degree.
N.J.S.A. 9:6-1 in pertinent part reads as follows:
Cruelty to a child shall consist in any of the following acts: (a) inflicting unnecessarily severe corporal punishment upon a child; (b) inflicting upon a child unnecessary suffering or pain, either mental or physical; (c) habitually tormenting, vexing or afflicting a child; (d) any willful act of omission or commission whereby unnecessary pain and suffering, whether mental or physical is caused or permitted to be inflicted on a child; (e) or exposing a child to unnecessary hardship, fatigue or mental or physical strains that may tend to injure the health or physical or moral well-being of such child. [Emphasis supplied.]
In light of our holding in State v. Muniz, 150 N.J. Super. 436 (App.Div. 1977), certif. den. 77 N.J. 473 (1978), it is clear that pursuant to N.J.S.A. 9:6-1, 9:6-3 and 9:6-8.21, defendant had a duty to prevent Shawn's painful death. In Muniz we said:
Within these definitions and within the framework of the evidence it was appropriate for the jury to consider whether under the circumstantial evidence adduced before it either one or both defendants were guilty of cruelty or neglect as defined for them and whether the evidence was sufficient to permit *490 the jury to determine that either one or both inflicted the injuries upon the child, or, if only one was responsible, that the other either permitted the same to be done without sufficient effort to prevent the assault or failed `to do or permit to be done any act necessary for the child's physical * * * well-being.' This latter definition could include a failure to complain to the proper authorities, failure to call the hospital and ask for emergency help or even failure to have sought medical care sooner. It could also include neglect as indicated by the physical conditions in addition to or separate from the traumatically initiated physical condition of the child. [Id. at 444.] [Emphasis added.]
We find no merit to defendant's contention as to the accuracy or sufficiency of the judge's charge concerning accomplice liability and omission to act.

F. MOTIONS FOR ACQUITTAL OR NEW TRIAL
Defendant's motion for dismissal at the end of the State's case and his motion for a judgment n.o.v., on the basis of insufficiency of evidence, as well as his motion for a new trial, were properly denied by the trial judge. Defendant based his motion for a new trial on essentially the same grounds as are presented on this appeal, in addition to a contention that the verdict was against the weight of the evidence. We have heretofore discussed the other points raised by defendant and are satisfied that the trial judge appropriately dealt with the sufficiency and the weight of the evidence supporting the jury's guilty verdict. See State v. Martinez, 97 N.J. 567, 571-572 (1984), and State v. Reyes, 50 N.J. 454 (1967). See also State v. Martin, 213 N.J. Super. 426 (App.Div. 1986).
Davell clearly testified that defendant stepped on Shawn's back, punched him in the eye and threw him into a tub full of water. Davell consistently implicated defendant in his various statements, specifically that defendant stepped on Shawn's back. This was consistent with the findings of the pathologist that Shawn had suffered two recent lesions on the upper back and right middle portion of the back. Likewise, ample evidence was produced by the State to support the jury's guilty verdict of endangering the welfare of a child. N.J.S.A. 2C:24-4(a). In denying defendant's first acquittal motion, the trial judge properly found sufficient evidence that defendant *491 either had a legal duty to care for Shawn or had assumed that responsibility as required under N.J.S.A. 2C:24-4(a). Defendant's motion for a new trial was properly denied. It does not clearly appear that there was a miscarriage of justice under the law. R. 2:10-1; see State v. Sims, 65 N.J. 359, 373-374 (1974). Appellate review is limited to the correction of injustice resulting from a plain and obvious failure of the jury to perform its function. State v. Johnson, 203 N.J. Super. 127, 134 (App.Div. 1985), certif. den. 102 N.J. 312 (1985).

G. MERGER
Defendant contends that his conviction for endangering the welfare of a child under N.J.S.A. 2C:24-4a should have merged into his conviction for aggravated manslaughter under N.J.S.A. 2C:11-4a. Although expressing some reservations initially,[10] the trial judge ultimately concluded:
I think that as part of a single prosecution, there is no merger either constitutionally or statutorily required. I do not believe that N.J.S.A. 2C:1-8a(4) applies.
However, for reasons which he expressed, the trial judge imposed a concurrent sentence on the endangering conviction. The State notes that the endangering count charged that the offense was committed "on or about" September 26, 1982. Proofs at the trial established that on September 25, 1982, the day before Shawn's death, defendant had taken responsibility for watching the children while Nicely underwent an abortion at the hospital. Although defendant took Nicely to the hospital, Shawn was left at home alone where he was to be looked in on by Kerry White, the child who lived upstairs. When defendant returned from the hospital he noticed that Shawn's arm was swollen. Shawn told him that he had fallen and his arm hurt. *492 Defendant rubbed alcohol on the arm. Defendant also observed belt marks on Shawn's back and bruises on his chest. The autopsy revealed that Shawn had sustained an extremely painful fracture of the distal end of his left elbow, by the infliction of a tremendous amount of force estimated to have occurred between six days and 24 hours before his death. Yet, when defendant returned to the hospital to pick up Nicely after her abortion, with Shawn in the car, he made no effort to obtain medical attention for these injuries. When he returned from the hospital with Nicely, he went out with his friends and remained out until the early morning hours. As the prosecutor noted in his summation, "A loving father tends to the medical needs of his son. Allen Bass let Shawn suffer with a broken and swollen arm for a whole day while he went joyriding." This failure to provide medical attention for the child's injuries was harm sufficient to make Shawn an abused or neglected child within the meaning of N.J.S.A. 2C:24-4(a), quite apart from the testimony as to the events on September 26 resulting in Shawn's death.
In State v. Hofford, 169 N.J. Super. 377, 386-387 (App.Div. 1979), we rejected the view that child cruelty, under N.J.S.A. 9:6-1 and 9:6-3, is a lesser included offense of manslaughter. We held, however, that the cruelty and manslaughter convictions and sentences, based upon defendants giving paregoric to their children, should have merged "since the same conduct resulted in both convictions." Id. at 385. In this case, unlike Hofford, defendant cannot claim the benefit of the so-called "same transaction" test. He committed two separate and distinct crimes, notwithstanding their proximity to each other. Cf. State v. Fraction, 206 N.J. Super. 532, 536-540 (App.Div. 1985). Although the treatment of Shawn by defendant on September 26, 1982, or his omission to act in the face of Nicely's conduct toward Shawn that day, might also be sufficient for conviction on the endangering count and may have warranted merger, we cannot say that the trial judge erroneously concluded that there was no merger either constitutionally or statutorily required. *493 Compare State v. Miller, 108 N.J. 112 (1987), where the Court said as to the merger of convictions for aggravated sexual assault and child endangerment:
[T]he offenses are different because the crime of endangering the welfare of a child is aimed not only at specific conduct but also at the violation of the duty that a parent owes to a child. [at p. 118.]
Affirmed.
NOTES
[1] Although defendant was charged with purposely or knowingly murdering the victim by his own conduct (N.J.S.A. 2C:11-3a(1), (2) and c.), a capital offense, he was found not guilty of that offense but guilty of the included offense of aggravated manslaughter (N.J.S.A. 2C:11-4a).
[2] The additional children are Allen, Michael and Stephen, the last of whom was left in a hospital to be placed in a foster home.
[3] In a separate unpublished opinion filed today, State v. Nicely, Docket No. A-799-83T4, we are affirming the conviction of Renee Nicely of murder, aggravated assault and endangering the welfare of a child.
[4] It is argued on this appeal that this testimony was hearsay which was improperly admitted into evidence.
[5] See State v. Bass, 189 N.J. Super. 445 (Law Div. 1983); State v. Bass, 189 N.J. Super. 461 (Law Div. 1983); State v. Bass, 191 N.J. Super. 343 (Law Div. 1983); State v. Bass, 191 N.J. Super. 347 (Law Div. 1983), rev'd by Appellate Division, rev'd sub nom. State v. Nicely, 94 N.J. 550 (1983).
[6] In a statement to the police, quoted in the presentence report, Nicely said, "A long time ago Allen burned Shawn twice on his butt (each buttocks) with a lightbulb in a lamp." However, this was not part of the evidence received at trial.
[7] Defendant ignores the testimony of Davell as to the occasion when Shawn was injured when pushed by defendant on the "horsey" with wheels, and that defendant got Shawn drunk by giving him beer and liquor.
[8] We distinguished the admission of this evidence from fresh complaint evidence which, as we noted, is corroboration of a victim's testimony concerning a sexual attack. Such testimony negates an inference that, had no such complaint to a confidant been made, the credibility of the victim would be questioned. It is not substantive evidence of the crime. See 214 N.J. Super., 295-296 n. 10.
[9] Defendant testified that he thought Shawn was his child and he loved him. In response to a question on cross-examination, "This is your son we're talking about now, right?" defendant replied, "Right."
[10] At one point, in discussing the proposed charge with the attorneys, the trial judge said: "Under the facts and with the consent of the State, I may easily tell the jury not to consider the fourth count (charging endangering the welfare of the child) against Mr. Bass, if they find him guilty of murder, aggravated manslaughter or manslaughter."