# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0066-16T2

STATE OF NEW JERSEY,

      Plaintiff-Respondent,

v.

JOHN GONZALEZ,

      Defendant-Appellant.

_____

> Argued September 12, 2018 – Decided  October 19, 2018
>
> Before Judges Yannotti, Gilson, and Natali.
>
> On appeal from Superior Court of New Jersey, Law Division, Camden County, Indictment No. 13-02-0503.
>
> Stephen P. Hunter, Assistant Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Stephen P. Hunter, of counsel and on the briefs).
>
> Adam D. Klein, Deputy Attorney General, argued the cause for respondent (Gurbir S. Grewal, Attorney General, attorney; Adam D. Klein, of counsel and on the brief).
>
> Appellant filed a pro se supplemental brief.

PER CURIAM

Defendant John Gonzalez and co-defendant Steven Alicea were charged with numerous crimes related to two incidents that took place on the same day. The first incident involved a robbery and murder, and the second involved a home invasion, robbery, and aggravated sexual assaults. Defendant and Alicea were tried separately.[1]

A jury found defendant not guilty of murder, but guilty of numerous other crimes, including first-degree armed robbery, N.J.S.A. 2C:15-1, and first-degree aggravated sexual assault, N.J.S.A. 2C:14-2(a)(3). Defendant was sentenced to an aggregate prison term of forty-one years with just over thirty-two years of parole ineligibility. He appeals his convictions and sentence. We affirm.

I.

The two incidents that gave rise to defendant's convictions occurred on September 30, 2011, when defendant was sixteen years old. There were three victims: L.B. was robbed and murdered; G.T. was robbed; and B.C. was robbed

---

[1] Co-defendant Alicea has filed a separate appeal, which we have addressed in a separate opinion. See State v. Alicea, No. A-1363-16 (App. Div. Oct. 19, 2018).

A-0066-16T2

and sexually assaulted.[2]   At trial, G.T., B.C., and other witnesses testified. Defendant also testified.

On September 30, 2011, C.B., a friend of L.B., had made arrangements to meet her at his home.  Anticipating her arrival, C.B. was looking out a window on the second floor of his house.  In the evening, he saw L.B. arrive in a white van.  C.B. then saw three Hispanic men in hooded sweatshirts approach the van. He noted that one of the men's sweatshirts had a cartoon character's face on the front.  One of the men went to the driver's side of the van and the other two men went to the passenger's side.

L.B. exited the van and began walking towards C.B.'s door.  C.B. left the window and walked downstairs to open the door for L.B.  Before he opened the door, he heard L.B. say:  "I don't have anything," and "stay away from me[.]" He then heard gunshots.  C.B. went back upstairs, looked out the window, and saw L.B. sitting on his front steps.  A few minutes later, he saw another woman he knew as "Cookie" come around the street corner, approach L.B., and he heard L.B. tell Cookie "they shot me."  Cookie called 911.

---

[2]  We use initials to protect the privacy of the victims and witnesses.

A-0066-16T2

That same night, G.T. was at his home, which was located less than two blocks from where L.B. was shot. G.T. was over eighty years old at the time, and B.C., his former caretaker and friend, was living with him.

Just after 11 p.m., G.T. and B.C. heard bangs on their door. G.T. opened the door and observed three men on the sidewalk. G.T. asked the men if they had been banging on his door. The men said no and G.T. returned inside the house. Immediately thereafter, G.T. and B.C. heard more banging on the door. G.T. opened the door for a second time, and the three men then entered the home, two of whom had guns and one of whom was pointing a gun at G.T. The men demanded money from G.T. The men then told B.C. to take her clothes off and forced her to perform oral sex on G.T. Thereafter, B.C. was forced to perform oral sex on the three men and each of the men raped her vaginally and anally. When B.C. tried to resist the assaults, she was punched and hit with a gun.

While at the home, the men searched for and took various items, including watches, keys, a cell phone, a camera kit, coins, and a chain. The men also threatened G.T. and B.C. throughout the time that they were at the home. Eventually, the men left the home. G.T. then called the police.

The police arrived shortly thereafter and began to search the area for the suspects. Police officers saw three men who began to run when the officers

4

stopped to question them. The officers pursued and eventually apprehended defendant and Alicea. The third suspect, escaped and apparently has not been located.

While pursuing defendant, an officer saw defendant discard a blue sweatshirt that was later recovered. Inside the sweatshirt, the police found a handgun. When defendant was searched incident to his arrest, the police found two watches and a chain belonging to B.C. and G.T. After being arrested, defendant was taken to G.T.'s home and G.T. identified defendant as one of the men involved in the robbery and sexual assaults.

In the meantime, B.C. was taken to the hospital and evaluated by a sexual assault nurse examiner (SANE nurse). During the examination, B.C. described the sequence of events leading up to the sexual assaults and what the suspects looked like. After her examination, B.C. was taken to the police station where she identified defendant in a photo array.

Following defendant's arrest, he was read his Miranda[3] rights and agreed to give a statement. Thereafter, he admitted to being at the scenes of the murder and home invasion. He also acknowledged that he had been wearing a blue

---

[3] Miranda v. Arizona, 384 U.S. 436 (1966).

A-0066-16T2

hooded sweatshirt and that he had been carrying a gun. Prior to trial, defendant moved to suppress his statement, but the court denied that motion.

Although a juvenile when the crimes were committed, defendant was tried as an adult. The trial was conducted during six days in January 2016. As noted, G.T., B.C., and numerous other witnesses testified at trial. Defendant also testified. Defendant told the jury that he was selling drugs in Camden on September 30, 2011. He acknowledged wearing a blue "Cookie Monster" sweatshirt and having a gun when he met up with Alicea and the third suspect, who he referred to as "D.J." He also acknowledged walking up to a white van to sell drugs. During the sale, he heard yelling and then gunshots from the other side of the van. He started to run and followed Alicea and D.J. Alicea told defendant: "I shot that bitch, because she didn't want to give me nothing." Defendant claimed, however, that he did not know that Alicea and D.J. were planning to rob anyone.

Defendant then related that he and his two companions ran until they reached G.T.'s home. Alicea told defendant that the woman who lived there owed him money. Defendant explained that when he went into the home, he was frightened about what had happened down the street and he wanted "a little hideaway" from the police. Defendant denied having anything to do with the

6

crimes committed at the home. He acknowledged, however, that he saw Alicea put a gun in G.T.'s mouth and he saw Alicea and D.J. sexually assault B.C.

After hearing the evidence, the jury convicted defendant of eleven crimes: second-degree burglary, N.J.S.A. 2C:18-2; first-degree armed robbery, N.J.S.A. 2C:15-1; first-degree aggravated sexual assault, N.J.S.A. 2C:14-2(a)(3); second-degree conspiracy to commit burglary, N.J.S.A. 2C:5-2 and N.J.S.A. 2C:18-2; second-degree conspiracy to commit robbery, N.J.S.A. 2C:5-2 and N.J.S.A. 2C:15-1; second-degree conspiracy to commit sexual assault, N.J.S.A. 2C:5-2 and N.J.S.A. 2C:14-2(a)(3); various weapon offenses; and felony murder. The trial court, however, vacated the conviction for felony murder.

At sentencing, a number of defendant's convictions were merged and, as noted earlier, he was sentenced to an aggregate prison term of forty-one years with just over thirty-two years of parole ineligibility. Specifically, defendant was sentenced to fifteen years in prison subject to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2, for first-degree robbery; eighteen years in prison subject to NERA for first-degree aggravated sexual assault; and eight years in prison with four years of parole ineligibility for second-degree unlawful possession of a weapon. Those sentences were to be served consecutively, and his remaining sentences were to run concurrent to those sentences. Defendant

7

was also sentenced to parole supervision, including parole supervision for life, restrictions under Megan's Law, N.J.S.A. 2C:7-1 to -23, and restrictions under Nicole's Law, N.J.S.A. 2C:14-12 and N.J.S.A. 2C:44-8.

## II.

On appeal, defendant makes five arguments. His counsel makes four arguments, which counsel articulates as follows:

> POINT I – THE TRIAL COURT'S FAILURE TO CHARGE TRESPASS AS A LESSER-INCLUDED OFFENSE OF BURGLARY WAS PLAIN ERROR BECAUSE THE DEFENDANT'S TESTIMONY CLEARLY INDICATED A NON-CRIMINAL PURPOSE FOR ENTERING [G.T.'s] HOME.
>
> POINT II – THE TRIAL COURT'S FAILURE TO INSTRUCT THE JURY THAT DEFENDANT COULD BE FOUND GUILTY OF A LESSER OFFENSE AS AN ACCOMPLICE, ON THE BASIS OF HIS OWN MENTAL STATE, EVEN IF THE CODEFENDANT, THE GUNMAN, HAD THE MENTAL STATE FOR ARMED ROBBERY, DEPRIVED DEFENDANT OF THE RIGHT TO DUE PROCESS OF LAW AND A FAIR TRIAL.
>
> POINT III – THE TRIAL COURT COMMITTED PLAIN ERROR IN ALLOWING THE SEXUAL ASSAULT NURSE EXAMINER TO PRESENT DETAILED TESTIMONY REGARDING THE ALLEGED ASSAULT, WHICH WAS HEARSAY UNDER THE MEDICAL EXCEPTION RULE, AND IMPROPERLY BOLSTERED [B.C.'s] CREDIBILITY.

A-0066-16T2

POINT IV – DEFENDANT'S SENTENCE OF FORTY- [ONE] YEARS IN PRISON WITH MORE THAN THIRTY-TWO YEARS OF PAROLE DISQUALIFICATION, IMPOSED UPON HIM FOR CRIMES COMMITTED WHILE A JUVENILE, VIOLATED THE EIGHTH AMENDMENT AND ARTICLE ONE, PARAGRAPH TWELVE OF THE NEW JERSEY CONSTITUTION BECAUSE THE SENTENCE WAS IMPOSED WITHOUT CONSIDERATION OF HIS AGE AT THE TIME OF THE CRIME. THEREFORE, THE SENTENCE IS ILLEGAL, REQUIRING RESENTENCING UNDER STATE V. ZUBER, 227 N.J. 422 (2017).

Defendant also filed a pro se letter brief, where he makes a fifth argument, which he articulates as follows:

POINT I – TRIAL COURT ERRED WHEN IT HELD THAT DEFENDANT'S WAIVER OF HIS RIGHT TO REMAIN SILENT WAS KNOWING AND VOLUNTARY WITHOUT HIS PARENT AND/OR ATTORNEY BEING PRESENT WHICH VIOLATED DEFENDANT'S FIFTH AMENDMENT RIGHT AGAINST SELF-INCRIMINATION.

We are not persuaded by any of these arguments. We first address the motion to suppress. Next, we analyze the contentions concerning the two lesser-included charges. Thereafter, we examine the testimony by the SANE nurse. Finally, we evaluate the sentencing argument.

9

1.    The Motion to Suppress

Defendant contends that the trial court erred in denying his motion to suppress a statement that he gave to law enforcement officers. Specifically, he focuses on the fact that he was sixteen years old at the time that he gave the statement and that neither his attorney nor his mother were present when he was interviewed.

During an interrogation of a juvenile, "a parent or legal guardian should be present in the interrogation room, whenever possible." State v. Presha, 163 N.J. 304, 315 (2000) (citing State ex rel. S.H., 61 N.J. 108, 114-15 (1972)). As such, police need to use their "best efforts" to locate a parent or legal guardian before questioning a juvenile. Id. at 316 (citing State ex rel. J.F., 286 N.J. Super. 89, 98 (App. Div. 1995)). Nonetheless, once located, a parent or guardian may decline to be present at the interrogation. Id. at 317; State ex rel. Q.N., 179 N.J. 165, 173 (2004).

The absence of a parent or legal guardian will not automatically render a statement inadmissible, particularly when the juvenile providing the statement is over the age of fourteen. See Presha, 163 N.J. at 308, 317; see also State ex rel. A.S., 203 N.J. 131, 148-49 (2010). Instead, an interrogation may still be conducted so long as the officers act with "the utmost fairness and in accordance

10    A-0066-16T2

with the highest standards of due process and fundamental fairness." Presha, 163 N.J. at 317 (first quoting S.H., 61 N.J. at 115; then citing State v. R.W., 115 N.J. Super. 286, 296 (App. Div. 1971)).

To evaluate the voluntariness of a statement, the court considers the "the totality of circumstances" surrounding the interrogation. Id. at 308, 317. A statement is admissible if it is "made knowingly, intelligently, and voluntarily." A.S., 203 N.J. at 146 (citing Presha, 163 N.J. at 313). In reviewing the "totality of circumstances," the court considers the following factors: a suspect's age, education, intelligence, prior contacts with the criminal justice system, length of detention, advisement of constitutional rights, the nature of the questioning, and whether physical punishment or mental exhaustion were involved in the interrogation process. Ibid. (quoting State v. Miller, 76 N.J. 392, 402 (1978)). Nonetheless, in situations involving a juvenile defendant, the absence of a parent or legal guardian is a "highly significant factor" affecting the totality of the circumstances. Id. at 147 (quoting Presha, 163 N.J. at 315).

The trial court here conducted a multi-day evidentiary hearing to evaluate defendant's motion to suppress his statement. The court heard testimony from five law enforcement officials, defendant's attorney, and defendant's mother. After hearing that testimony, the court made findings of facts. In that regard,

11

the court found that in October 2011, defendant asked to give a statement to law enforcement officials. Members of the prosecutor's office then spoke with defendant's attorney. After conferring with defendant's mother, defense counsel authorized the prosecutor to speak with defendant. Defense counsel was invited to be present while defendant gave his statement, but counsel stated that he had to be in municipal court and, therefore, could not attend the interview. Thus, the trial court found that the prosecutor's office believed it had been given permission to interview defendant by defense counsel and, through defense counsel, by defendant's mother.

The trial court also found that there was no dispute that defendant was read his <u>Miranda</u> rights, understood those rights, and waived those rights. Accordingly, the trial court concluded that the State had used its best efforts to have defendant's attorney or parent present for the interview and, under the totality of the circumstances, the interview was lawful. Thus, the trial court denied defendant's motion to suppress his statement.

When reviewing the trial court's decision on a motion to suppress a statement, we generally defer to the factual findings of the trial court when supported by credible evidence in the record. <u>See</u> <u>State v. Nyhammer</u>, 197 N.J. 383, 409 (2009). Moreover, we defer to the trial judge's findings that are

12

"substantially influenced by [the judge's] opportunity to hear and see the witnesses and to have the 'feel' of the case, which a reviewing court cannot enjoy[.]"  State v. Davila, 203 N.J. 97, 109-10 (2010) (quoting State v. Johnson, 42 N.J. 146, 161-62 (1964)).  We review de novo the trial court's legal conclusions that flow from established facts.  State v. Mann, 203 N.J. 328, 337 (2010).

Here, the record supports the trial judge's findings that defendant voluntarily, knowingly, and intelligently waived his Miranda rights.  The record also supports the trial judge's finding that the law enforcement officers involved in interviewing defendant had received permission to conduct the interview from defense counsel and defense counsel had informed them that defendant's mother had also authorized the interview.  Indeed, when defendant was interviewed, defendant himself acknowledged that his mother had spoken to his attorney, his attorney had spoken with him, and his attorney knew that he was being interviewed.  Thus, there was a showing that the relevant law enforcement officials had used their best efforts to inform and obtain permission from defendant's lawyer and mother before questioning defendant.  Therefore, under the totality of these circumstances, we discern no error in the trial court's denial of defendant's motion to suppress his statement.

2.    The Lesser-Included Charges

Jury charges are critical in guiding deliberations in criminal trials. State v. Jenkins, 178 N.J. 347, 361 (2004) (citing State v. Jordan, 147 N.J. 409, 421-22 (1997)). Consequently, improper instructions on material issues are presumed to constitute reversible error even when a defendant fails to object at trial. Ibid. Moreover, "a defendant is entitled to a charge on all lesser included offenses supported by the evidence." State v. Short, 131 N.J. 47, 53 (1993). Accordingly, the trial court "has an independent obligation to instruct on lesser-included charges when the facts adduced at trial clearly indicate that a jury could convict on the lesser while acquitting on the greater offense." Jenkins, 178 N.J. at 361. The key consideration is whether the evidence clearly indicates the need for the instruction. A trial court is not obligated to "meticulously . . . sift through the entire record in every . . . trial to see if some combination of facts and inferences might rationally sustain a [lesser-included] charge." State v. Funderburg, 225 N.J. 66, 70 (2016) (quoting State v. Choice, 98 N.J. 295, 299 (1985)).

a.    The lesser-included offense of trespass.

Defendant argues that the trial court erred by failing to charge trespass as a lesser-included offense of burglary. Defendant did not request that charge at

14

trial and, therefore, we review this argument for plain error. R. 2:10-2. Under that standard, the error must be "clearly capable of producing an unjust result[.]" Ibid. A conviction will only be reversed if the error at trial is sufficient to raise "a reasonable doubt . . . as to whether the error led the jury to a result it otherwise might not have reached." Funderburg, 225 N.J. at 79 (quoting Jenkins, 178 N.J. at 361). Furthermore, when there is no objection to the charge, we "presum[e] that the charge was not error and was unlikely to prejudice the defendant's case[.]" State v. Young, 448 N.J. Super. 206, 224 (App. Div. 2017) (alteration in original) (quoting State v. Singleton, 211 N.J. 157, 182 (2012)).

A defendant is guilty of burglary if he or she: (1) enters a structure that is not open to the public or that the person is not licensed or privileged to enter, or surreptitiously remains in a structure knowing that he or she is not licensed or privileged to do so; and (2) has the purpose to commit an offense therein. N.J.S.A. 2C:18-2(a). A defendant is guilty of criminal trespass if he or she: (1) enters or surreptitiously remains in a structure and (2) knows that he or she is not licensed or privileged to do so. N.J.S.A. 2C:18-3(a).

Here, defendant contends that the failure to charge trespass as a lesser-included offense of burglary requires reversal of his convictions for burglary, aggravated sexual assault, conspiracy to commit burglary, and conspiracy to

A-0066-16T2

commit aggravated sexual assault. The aggravated sexual assault offenses are implicated because an actor is guilty of aggravated assault if the act is committed during the commission of certain offenses, including burglary. N.J.S.A. 2C:14-2(a)(3). Having reviewed the record, we discern no reversible error in the trial court's failure to sua sponte instruct the jury on the charge of trespass.

The jury found defendant guilty of multiple crimes during the home invasion, including robbery of G.T. and aggravated sexual assault of B.C. Defendant, however, claims he entered G.T.'s home because he was afraid of being arrested following L.B.'s murder. He claims that he had no intent to commit a robbery or sexual assault while in the home. The evidence, however, did not clearly indicate that the jury should be instructed on trespass. Defendant himself testified that he had a gun when he entered G.T.'s home and he also testified that he saw that Alicea had a gun. Defendant also acknowledged that he saw Alicea and D.J. acting aggressively towards G.T. and repeatedly sexually assaulting B.C. Finally, defendant was found to be in possession of property stolen from G.T. and B.C. Accordingly, to accept defendant's argument, we would have to assume that if charged on trespass, the jury would have found defendant not guilty of the robbery and the sexual assault that occurred at the

16

home.  The testimony and evidence at trial simply does not support such a conclusion.

        b.      Accomplice liability for lesser-included offenses.

Defendant next argues that the trial court erred in failing to charge the jury on accomplice liability for lesser-included offenses.  Here again, defendant did not ask for the charges at trial and, therefore, we review for plain error.

The jury was properly instructed on first- and second-degree robbery, theft as a lesser-included offense, and accomplice liability.  If the court provides the accomplice charge, "the court is obligated to provide the jury with accurate and understandable jury instructions regarding accomplice liability even without a request by defense counsel."  State v. Bielkiewicz, 267 N.J. Super. 520, 527 (App. Div. 1993) (quoting State v. Weeks, 107 N.J. 396, 410 (1987)).  In that regard, a "jury must be instructed that [the] defendant 'shared in the intent which is the crime's basic element, and at least indirectly participated in the commission of the criminal act.'"  State v. Oliver, 316 N.J. Super. 592, 596 (App. Div. 1998) (quoting Bielkiewicz, 267 N.J. Super. at 528).  Moreover, "[a]n accomplice is only guilty of the same crime committed by the principal if he [or she] shares the same criminal state of mind as the principal."  State v. Whitaker, 200 N.J. 444, 458 (2009) (citing State v. White, 98 N.J. 122, 129 (1984)).

17

Here, defendant argues that Alicea could have intended to commit armed robbery, while he only intended to commit unarmed robbery or theft. The court gave the jury the option of finding defendant guilty of first-degree or second-degree robbery, as well as theft from a person. The court also charged the jury on accomplice liability, explaining that the State had to prove that defendant possessed the same criminal state of mind as the person who actually committed the offense.

Defendant, nevertheless, contends that the jury should have been instructed that he could have been found guilty as an accomplice of a lesser-included offense, even though the principal is found guilty of a more serious offense. The absence of such a charge at defendant's trial was not plain error. There was strong evidence that defendant committed armed robbery as a principal. In that regard, defendant himself testified that he entered G.T.'s home armed with a loaded handgun.

Failure to give a Bielkiewicz charge to the jury is not always reversible error. See State v. Ingram, 196 N.J. 23, 40 (2008). In Ingram, our Supreme Court explained:

> [I]t was not reversible error when the trial court instructed the jury on the elements of the offenses of robbery and theft, together with the elements required for accomplice liability, without also specifically

charging that "[o]ur law recognizes that two or more persons may participate in the commission of an offense but each may participate therein with a different state of mind" and that "[t]he liability or responsibility of each participant for any ensuing offense is dependent on his/her own state of mind and not on anyone else's."

[Ibid. (alterations in original) (quoting Model Jury Charges (Criminal), "Liability for Another's Conduct (N.J.S.A. 2C:2-6)" (May 22, 1995)).]

During defendant's trial, the court repeatedly instructed the jury that defendant could not be found guilty of a crime if he did not possess the requisite criminal state of mind. In that regard, the court explained that to be found guilty of robbery, burglary, or aggravated sexual assault as an accomplice, defendant needed to "posses[s] [the] criminal state of mind that is required to be prove[n] against the person who actually committed the criminal act." Consequently, having evaluated the jury charge in its entirety, the jury was clearly instructed that defendant could not be convicted of any crime as an accomplice unless he had the criminal intent for that crime.

3.    The Testimony by the SANE Nurse

Defendant contends that it was plain error for the trial court to admit hearsay testimony by the SANE nurse who examined B.C. Specifically, defendant argues that the nurse's testimony was hearsay and did not fall within

19

the ambit of the medical diagnosis or treatment exception rule and also improperly bolstered B.C.'s credibility.

We review trial court evidentiary rulings for an abuse of discretion. State v. Gorthy, 226 N.J. 516, 539 (2016). Moreover, here there was no objection made at trial and, therefore, we review this issue for plain error. R. 2:10-2.

Hearsay "is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." N.J.R.E. 801(c). Statements made for the purpose of medical diagnosis or treatment are exceptions to the hearsay rule. N.J.R.E. 803(c)(4). The medical diagnosis or treatment exception is based on the assumption that the declarant is focused on obtaining a diagnosis and treatment culminating in medical recovery. State ex rel. C.A., 201 N.J. Super. 28, 33-34 (App. Div. 1985).

At trial, the SANE nurse testified that she went to the hospital to find out what had happened to B.C., who she viewed as a "patient" and explained that her "primary goal [wa]s the patient's emotional and physical well-being." The SANE nurse also explained that part of her job was to make sure that the patient did not have injuries, or if she was injured, to have those injuries treated.

The SANE nurse then testified as to what B.C. recounted to her concerning the sexual assaults. In that regard, the SANE nurse explained that B.C. had told her that three men, two of whom were armed, forced their way into her home, directed her to strip off her clothes, and forced her to perform oral sex. B.C. also explained that she was raped anally and vaginally by all three assailants. B.C. did not provide the SANE nurse with a specific identification of any of the assailants; rather, she described them as "Spanish."

Having reviewed the SANE nurse's testimony, we find no plain error in the admission of that testimony. The majority of the testimony fell within the medical diagnosis and treatment exception to the hearsay rule. The SANE nurse did not testify concerning B.C.'s identification of defendant. Instead, B.C. herself testified at trial and identified defendant as one of the men who had robbed and sexually assaulted her. In short, the testimony by the SANE nurse was not clearly capable of leading a jury to an unjust result. R. 2:10-2.

4.    The Sentence

Defendant contends that his sentence, which aggregated to forty-one years in prison with just over thirty-two years of parole ineligibility, violates the constitutional prohibitions against cruel and unusual punishment because his

youthful age was not appropriately considered by the sentencing judge. We disagree.

In sentencing juveniles, special considerations must be evaluated when the juvenile is sentenced to life in prison or lengthy overall terms of imprisonment. Miller v. Alabama, 567 U.S. 460, 473-74, 476-80 (2012); State v. Zuber, 227 N.J. 422, 429 (2017). The United States Supreme Court has held that "the Eighth Amendment [of the Constitution] forbids a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders." Miller, 567 U.S. at 479. In Miller, the Supreme Court did not "foreclose" life without parole for juveniles convicted of murder, but it did require sentencing judges "to take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." Id. at 480. Thus, the Supreme Court in Miller identified five factors (the Miller factors) that sentencing judges should consider in sentencing juveniles to life in prison without the possibility of parole. Id. at 477-78.

Our Supreme Court has adopted the Miller factors and held that those factors must be considered in sentencing juveniles to sentences "that are the practical equivalent of life without parole[.]" Zuber, 227 N.J. at 429. In Zuber, our Supreme Court also held that the Miller factors must be considered when "a

judge imposes consecutive terms that would result in a lengthy overall term of imprisonment for a juvenile[.]"  Ibid.

Accordingly, when a juvenile is sentenced to a lengthy overall term of imprisonment, a sentencing court must consider two sets of factors.  First, if the court is imposing consecutive sentences, it must consider the traditional factors set forth in State v. Yarbough, 100 N.J. 627, 643-44 (1985).  Zuber, 227 N.J. at 429.  Second, the sentencing court must also consider the Miller factors.  Ibid.

Here, defendant was sentenced on his convictions for ten offenses related to the robbery and sexual assaults that occurred on September 30, 2011, and involved multiple victims.  Defendant was sentenced to three consecutive sentences for first-degree robbery, first-degree aggravated sexual assault, and second-degree unlawful possession of a weapon.  The court also imposed thirty-two years and eighteen days of parole ineligibility.

In imposing that sentence, the court found four aggravating factors and considered, but rejected, mitigating factors.  Specifically, the court found aggravating factors three, "[t]he risk that the defendant will commit another offense[,]" N.J.S.A. 2C:44-1(a)(3); six, "[t]he extent of the defendant's prior criminal record and the seriousness of the offenses of which he has been convicted[,]" N.J.S.A. 2C:44-1(a)(6); nine, "[t]he need for deterring the

defendant and others from violating the law[,]" N.J.S.A. 2C:44-1(a)(9); and twelve, "[t]he defendant committed [an] offense against a person who he knew or should have known was 60 years of age or older," N.J.S.A. 2C:44-1(a)(12).

The sentencing court rejected defense counsel's argument for mitigating factor thirteen, that the conduct of defendant, who was sixteen at the time of the offenses, was substantially influenced by another more mature defendant. See N.J.S.A. 2C:44-1(b)(13). In discussing mitigating factor thirteen, the sentencing court considered defendant's youth at the time the crimes were committed. The court also considered the heinous nature of the crimes.

In summary, the sentencing judge analyzed applicable aggravating and mitigating factors and explained the basis for those factors. In imposing consecutive sentences, the sentencing judge also discussed the Yarbough factors and explained the reason for imposing consecutive sentences. As part of both of those analyses, the sentencing judge considered defendant's age, but ultimately found that his youth was not a mitigating factor given the nature of the crimes.

Read in full context, we are satisfied that the court sufficiently considered defendant's youth in imposing the consecutive sentences. In that regard, we note that the sentence, while lengthy, is not the equivalent of a life sentence.

24

Defendant was twenty years of age when he was sentenced and, thus, accounting for jail credits, he will be eligible for parole when he is still in his forties. Accordingly, we discern no abuse of discretion, State v. Blackmon, 202 N.J. 283, 297 (2010), nor an illegal sentence requiring a remand for a new sentence, Zuber, 227 N.J. at 447-48.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0066-16T2