STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v.
WILLIAM WEEKS, DEFENDANT-APPELLANT.

Argued March 3, 1987—Decided June 25, 1987.

*James L. Jukes,* Assistant Deputy Public Defender, argued the cause for appellant (*Alfred A. Slocum,* Public Defender, attorney; *James L. Jukes* and *Robert M. Schaaf,* Designated Counsel, of counsel and on the briefs).

*Meredith A. Cote,* Deputy Attorney General, argued the cause for respondent (*W. Cary Edwards,* Attorney General of New Jersey, attorney).

The opinion of the Court was delivered by

O'HERN, J.

We granted certification primarily to consider defendant's contention that the imposition of a Graves Act sentence following his conviction as an accomplice to robbery violated

principles of due process because the issue of eligibility for the mandatory sentence was not submitted separately to the jury. Defendant was convicted of first degree robbery, in violation of *N.J.S.A.* 2C:15–1b, because the principal was "armed with, or use[d] or threaten[ed] the immediate use of a deadly weapon." We find no want of due process in a sentencing procedure when, as here, the factual predicate for the Graves Act sentence essentially has been established by the jury's verdict.

This was one of the first cases presented to the trial court for sentencing under the then newly-enacted Graves Act, *N.J.S.A.* 2C:43–6, *L.*1981, *c.* 31. Defendant's assertion that the trial court impermissibly based the Graves Act sentence on consideration of a statement of his confederate that was not admitted in defendant's trial is not supported by the record. The trial court specifically stated that it was sentencing "in light of what I now have." The court satisfied itself that it had a jury finding of "robbery in the first degree, robbery while armed with a weapon," and that the only admitted evidence before the jury of a weapon indicated that the weapon was a gun. The court concluded: "I have no difficulty finding that by a preponderance of the evidence, it has been established that the defendant in this case, Mr. Weeks was an accomplice in an armed robbery with a weapon, which weapon was a firearm." Hence, there is no occasion here to consider the ramifications of other factual predicates recently considered by the United States Supreme Court. *See McMillan v. Pennsylvania,* 447 *U.S.* ——, 106 *S.Ct.* 2411, 91 *L.Ed.*2d 67 (1986).

■ Our review of the case, however, leads us to focus on the standard for determining the scope of an accomplice's liability for a criminal offense committed by another. The issue is of special relevance in the context of Graves Act sentencing because an unarmed accomplice who is convicted of an underlying offense predicated upon the possession of a firearm is treated as though in possession of the firearm. In plain words, if someone is convicted as an accomplice to armed robbery

involving a firearm, that person goes to prison for the term mandated by the Graves Act.

The defendant was charged as an accomplice to the robbery of a bakery. The alleged principal, Godfrey, was tried separately at about the same time defendant was tried. Defendant had been seen driving, with a passenger in his car, away from the area where the robbery occurred. When defendant was arrested soon after the robbery, he was alone and had only $12 in his possession. He maintained that both he and his wife were steadily employed, and hence he would have no reason to commit a robbery. But despite his claim that he did not know that his passenger planned a robbery, much less one with a weapon, defendant was convicted of first degree robbery because the evidence showed that he was an accomplice to a robbery committed with a gun. The trial court denied defendant's motion for a new trial, and sentenced him to a term of fifteen years in prison with a five year period of parole ineligibility pursuant to the Graves Act, *N.J.S.A.* 2C:43–6d.

On appeal to the Appellate Division, defendant argued that 1) the verdict was against the weight of the evidence; 2) the trial court abused its discretion in permitting examination about defendant's prior conviction for armed robbery and the principal's indictment for an alleged prior bank robbery; 3) the Graves Act was unconstitutional because the issue of sentence eligibility was not submitted separately to the jury; and 4) the trial court imposed a manifestly excessive sentence. In an unreported opinion, the Appellate Division affirmed the conviction and sentence. We granted defendant's petition for certification. 105 *N.J.* 533 (1986).

We find that an erroneous instruction on the necessity for shared purpose to commit the underlying crime, and an impermissibly broad introduction of evidence of other criminal conduct by the principal, combined to taint the defendant's conviction as an accomplice to robbery in the first degree, *N.J.S.A.*

2C:15–1b. Accordingly, we reverse the judgment of conviction below.

In *State v. White*, 98 *N.J.* 122 (1984), we interpreted the Graves Act to apply to the accomplice of an armed robbery under conditions outlined therein. We held that the Legislature would not have intended that the mastermind of an armed robbery could avoid a Graves Act sentence by having a confederate carry the gun. We said: "Surely, the Legislature intended that when an accomplice is guilty of a robbery that is held to be a crime of the first degree because one perpetrator used or possessed a firearm, the Graves Act would apply in sentencing the accomplice." *Id.* at 130.

Because the trial court sentenced defendant on a conviction of armed robbery, it did not have to consider the aspect of *State v. White, supra,* 98 *N.J.* at 13, that "[i]t is possible for an accomplice to be guilty of robbery and for his compatriot to be guilty of armed robbery." But the accomplice still may be eligible for Graves Act sentencing "if the accomplice, though found guilty only of robbery, knew or had reason to know before the crime was committed that his partner would possess or use a firearm while the crime was being committed * * *." *Ibid.*

■ In this case, defendant was found guilty of robbery, which was elevated to the first degree under *N.J.S.A.* 2C:15–1b because "in the course of committing the theft the [principal] * * * [was] armed with * * * a deadly weapon." Because of the serious consequences of this conviction as an accomplice, a clearer understanding of the scope of accomplice liability under the Code of Criminal Justice, *N.J.S.A.* 2C:2–6, must be imparted to the jury.

Accomplice law deviates from traditional legal rules in the sense that crimes are defined as if the accomplice actually committed the acts that constitute the offense. For example, the murderer "kills" and the rapist "intentionally has sexual intercourse with" or "carnally knows" the victim. The accomplice does none of these things, yet * * * is convicted of murder or rape, not of "aiding a murder" or "aiding a rapist."

[Dressler, "Reassessing the Theoretical Underpinnings of Accomplice Liability: New Solutions to an Old Problem," 37 *Hastings L.J.* 91, 92 n. 3 (1985).]

The author notes that early common law of accomplice liability was intricate and frequently illogical. "Felony law distinguished between 'principals,' who were either of the first degree or of the second degree, and 'accessories,' who were either 'before the fact' or 'after the fact.' " *Id.* at 94–95 (footnotes omitted). Distinctions were drawn between accomplices at the scene and perpetrators. The consequences of being labeled an accessory as opposed to an accomplice before the fact or after the fact were frequently crucial to the defendant's culpability. *Id.* at 95.

Legislative reform sought to clarify the distinctions between principals and all accessory or accomplice liability, with the result that accomplices are judged and punished as if they were the actual criminal offenders. *Id.* at 96–97. Because of a moral intuition about holding one accountable for the wrongdoing of another, *id.* at 108, the extent of accomplice liability has been defined carefully in our Code of Criminal Justice. We restate the summary made by Justice Schreiber in *State v. White, supra:*

Under the New Jersey Code of Criminal Justice (Code), a person is guilty of an offense if it is committed "by the conduct of another person for which he is legally accountable * * *." *N.J.S.A.* 2C:2–6a. Legal accountability exists when a person "is an accomplice of such other person in the commission of an offense." *N.J.S.A.* 2C:2–6b(3). The Code defines a person as the accomplice of another when:

[w]ith the purpose of promoting or facilitating the commission of *the* offense; he

(a) Solicits such other person to commit it;

(b) Aids or agrees or attempts to aid such other person in planning or committing it; or

(c) Having a legal duty to prevent the commission of the offense, fails to make proper effort so to do. [*N.J.S.A.* 2C:2–6c(1) (emphasis supplied).]

By definition an accomplice must be a person who acts with the *purpose* of promoting or facilitating the commission of *the* substantive offense for which he is charged as an accomplice. II *The New Jersey Penal Code: Final Report of the New Jersey Criminal Law Revision Commission* 57 (1971) observes that "one is 'legally accountable' for the conduct of another when he is an 'accomplice' of the other person 'in *the* offense.' By 'the offense' is meant that

offense charged for which guilt is in question under § 2C:2–6a." [Emphasis in original.]

The Code defines purposely as follows:

- A person acts purposely with respect to the nature of his conduct or a result thereof if it is his conscious object to engage in conduct of that nature or to cause such a result. [98 *N.J.* at 128–29.]

*See also State v. Gelb,* 212 *N.J.Super.* 582, 591 (App.Div.1986) (accomplice liability grounded on evidence of shared intent).

Justice Schreiber's exposition focuses on the word "purpose." The use of the word in the statute evidences a careful legislative judgment, concerning the degree of an accomplice liability, arrived at after extended debate. The drafters of the Model Penal Code (MPC) originally presented a tentative formulation of accomplice liability premised on the culpable mental state of knowledge[1] as the sufficient predicate for establishing the liability of the accessory. *See* Kadish, Schulhofer & Paulsen, *Criminal Law and Processes, Cases and Materials* 622 (4th ed. 1983) (citing Model Penal Code § 2.04(3)(b) (Tent.Draft No. 1, 1953)). This tentative formulation was rejected, and the MPC now specifically requires that the accomplice have the "purpose of promoting or facilitating the commission of the offense" of which the principal was convicted. *Model Penal Code and Commentaries* (Official Draft and Revised Comments) § 2.06(3)(a) (1985) (hereinafter *Model Penal Code and Commentaries* ). The language in *N.J.S.A.* 2C:2–6c(1) is identical.

"[T]he Institute rejected th[e] position [of broadened liability], principally on the argument that the need for stating a general principle in this section pointed toward a narrow formulation in order not to include situations where liability was inappropriate."[2] *Model Penal Code and Commentaries, supra,* at 318

---

[1]Knowledge can be equated with substantial certainty that a result will follow. *N.J.S.A.* 2C:2–2b(2).

[2]Examples were given by the MPC commentators of situations where guilty knowledge was deemed insufficient to warrant congruent liability: Farm boy

(comment to § 2.06). The drafters of our Code adopted this same policy:

> The [proposed New Jersey] Code limits the scope of liability to crimes which the accomplice had the purpose of promoting or facilitating. It is intended not to include those which he merely knowingly facilitated substantially. We agree with the MPC in this regard. Essentially, this issue is the extent to which it is deemed appropriate to require persons to avoid dealing with known criminals.
> [II *The New Jersey Penal Code: Final Report of The New Jersey Law Revision Commission* 58 (1971) (hereinafter *Revision Commission.*]

■ This narrow but important distinction between the culpable mental states of purpose and knowledge, set forth in the Code to establish the degree of accomplice liability, was effectuated inadequately in the trial of this case in two respects: (1) the instructions failed to convey to the jury that in order to convict the defendant as an accomplice to robbery in the first degree, an armed robbery, it had to find that the defendant had the *purpose* to participate in the crime defined in the Code, i.e., an armed robbery; and (2) the excessive cross-examination of the defendant about his *knowledge* of other alleged crimes of the principal combined with this erroneous instruction to create a clear capacity to lead the jury to conclude that "dealing with known criminals" would suffice as the mental state of culpability sufficient to convict.[3]

---

clears the ground for setting up a still, knowing that the venture is illicit; a landlord rents with knowledge that the premises will be used to establish a house of ill repute. *Model Penal Code and Commentaries* (Official Draft and Revised Comments) 316 (comment to § 2.06) (1985).

[3]Not to be confused is the distinction between one's purpose to engage in the criminal offense and one's purpose to bring about the result of the perpetrator's conduct. *See* Robinson, "Imputed Criminal Liability," 93 *Yale L.J.* 609, 637 (1984).

> One may want to assist the perpetrator, but also wish that a possible harmful result not occur. For example, if A and B are engaged in a robbery, A may desire to assist B in the robbery even though A realizes that his assistance will increase the chance of B's wounding the robbery victim. [*Id.* at 637 n. 99.]

On the first point, the jury instruction, the issue arises as plain error, under *Rule* 2:10–2, in our review of the defendant's contention that the verdict was against the weight of the evidence. Viewed, as the evidence must be, in the light most favorable to the State, *State v. Christener*, 71 *N.J.* 55, 66 (1976), the jury could have concluded that the defendant served as a "wheel man" in an armed robbery of a bakery in Franklin Township on February 26, 1981. One witness saw the defendant's car speed through the lot before the crime and park on the side of an adjoining store. She saw one of the men quickly leave the car, hurry back, and the car speed away down a side street. She said she had to pull her son out of the road to avoid injury. She was so upset that she wrote down the license plate number and gave it to the police, who quickly apprehended defendant. Several other witnesses also observed the defendant's red Chevrolet Monte Carlo being driven swiftly from the scene of the robbery.

At first the defendant denied being present in the area. A witness was brought to the police station and she quickly recognized on defendant the distinctive hat that the driver of the car had worn. Defendant's explanation was that he had no knowledge that his passenger, Godfrey, had a gun or intended to commit a robbery, and that he merely picked up Godfrey while the latter was walking on a township street. The defendant said that Godfrey simply requested a ride to the pharmacy located in the shopping center, which defendant furnished.

Since there was abundant evidence that the passenger had committed an armed robbery, this panoply of circumstances could sustain a conviction of the defendant since it provided sufficient evidence that he had the conscious object or design of facilitating the crime of robbery. The excessive speed in the parking lot, both before and after Godfrey entered the bakery,

---

Under such circumstances, it has been held that A may be convicted for felony murder. But see *N.J.S.A.* 2C:11–3a(3) qualifying the felony murder rule in New Jersey.

and inferences derived from the way that the floppy hat partially concealed defendant's face, all support a conviction for robbery.

But what we find troubling is the fact that the jury may not have known that an essential element of the accomplice liability charged is that the accomplice share the *purpose* to commit an *armed robbery*. The instructions to the jury in this respect were as follows:

> Finally, if you find beyond a reasonable doubt that the robber committed the crime of robbery and was armed with a deadly weapon or threatened the immediate use of a deadly weapon at the time of the commission of the robbery, then the defendant could be guilty of robbery in the first degree if you find beyond a reasonable doubt that he was an accomplice or an aider or abettor in that robbery.
>
> That brings us, ladies and gentlemen, to a discussion of the law as to aiding another or abetting in the commission of a crime. As I have said, the State contends that this defendant William Weeks was aiding or attempting to aid or had agreed to aid another person in the commission of the crime of robbery.

The court's instruction at this point recited the statutory premise of *N.J.S.A.* 2C:2–6c(1)(b) that a person is an accomplice of another in the commission of an offense if, with the purpose of promoting or facilitating the commission of the offense, he aids or agrees or attempts to aid the other person, and if he is found to "share the same intent required to be proven against the person who actually committed the act." The charge did not, however, equally relate those principles to the degrees of robbery involved. The jury was told:

> If you find that the defendant William Weeks willfully and knowingly aided, agreed to aid or attempted to aid another person in the commission of a robbery, then you must consider him a principal and equally guilty.

Hence, the instruction did not clearly require the jury to find that defendant had shared the purpose to commit a robbery *with a weapon*.

This instruction might not have been clearly capable of producing an unjust result had there not been the extensive attempt on the part of the State to predicate defendant's liability on "dealing with known criminals," a tactic that the

Code drafters specifically cautioned against. II *Revision Commission, supra*, at 58.

As noted, in the course of the trial the defendant contended that he had picked up the principal only to give him a ride to the drug store. In cross-examination, the State brought out that the defendant knew before the incident that the principal had been indicted for a previous armed robbery of a bank. In considering whether to permit that testimony, the trial court emphasized that the purpose or the use of the evidence was solely to impeach the defendant's testimony that he had "minimal knowledge and contact with Mr. Godfrey." Therefore, the court ruled that "[g]iving credence to his story that he d[id]n't know Godfrey was going in there [to commit a robbery], the State [was] entitled to prove that perhaps he [was] not quite as truthful as to Mr. Godfrey."

In other words, the sole purpose of the cross-examination was to test the *credibility* of the defendant. On this point, Chief Justice Weintraub long ago cautioned that collateral impeachment should not become a discursive excursion into extraneous matters. *See State v. Mathis*, 47 *N.J.* 455, 470–71 (1966). The introduction of other criminal conduct into a criminal trial is always carefully constrained. "A short version of the rule is [that] ' * * * it is not competent to prove one crime by proving another, * * *.' " *State v. Toshishige Yoshino*, 45 *Hawaii* 206, 210, 364 *P.*2d 638, 642 (1961) (quoting 22A *C.J.S. Criminal Law* § 682 (1961)). The central premise of the broad prohibition is that "the prosecution may not introduce evidence of other criminal acts of the accused unless the evidence is introduced for some purpose other than to suggest that because the defendant is a person of criminal character, it is more probable that he committed the crime for which he is on trial." *McCormick, Evidence* § 190, at 557–58 (E. Cleary 3d ed. 1984) (footnote omitted). Some limited purposes for which evidence of other criminal conduct by an accused may be admissible include establishment of a common scheme or plan, a signature crime, motive, and most frequently, to impeach the accused who

takes the witness stand, but only through a conviction. *Id.* at 558–64; *see Evid.R.* 55 (prior convictions of defendant inadmissible to prove disposition to commit criminal or civil wrong).

The discursive nature of this line of inquiry may be gleaned from some of the cross-examination of the defendant by the prosecutor:

Q Now, you said you knew something about Mr. Godfrey on that day when you stopped to pick him up.

Tell the jury what was it that you knew about Mr. Anthony Godfrey.

A I knew that he was out on bail for bank robbery.

Q That Mr. Godfrey was out on bail for bank robbery and you stopped to pick him up, right?

A Yes, sir.

\* \* \* \*

Q Mr. Weeks, tell the ladies and gentlemen of the jury, as far as the bank robbery, what you know, what happened to one of the other bank robbers who went along with Mr. Godfrey.

A He was killed in a car.

Q How was he killed?

A Killed. I don't know, sir.

Q You knew on that day one of the other bank robbers had been killed?

A Pardon me?

Q On the day that you picked up Godfrey you knew that he was out on bail for bank robbery and that during that bank robbery one of the other robbers had been killed, right?

A Yes, sir.

\* \* \* \*

Q The man you said you picked up, are you sure it was Godfrey that morning?

A Yes, sir.

Q The same Godfrey from the bank job?

A Yes, sir.

Q The First Savings & Loan where somebody was killed?

A Yes, sir.

\* \* \* \*

Q So you said to him, "Wait a minute. Godfrey, the bank robber, the guy who was in on the robbery of the First Savings & Loan Association where one of the robbers was killed, he might have been the one in the store." You must have told that to Detective Racz right then and there?

A No, sir.

And later, after the defendant explained on redirect that he had gathered this information from the newspaper, the prosecutor renewed the inquiry:

> Q  And what you read in the paper was that while Godfrey and others were escaping from the bank with the money the bomb blew up and the money—
> A  Yes.
> Q  —spread all over the inside of their car?
> A  It just said smoke.
> Q  Smoke and the car crashed?
> A  Into a house.
> Q  And one of the bank robbers was killed?  One of the guys that was with Godfrey, right?
> A  Yes, sir.

Since evidence of prior criminal conduct of the defendant himself would be sharply limited, and since evidence of prior criminal activity of the principal if he had been on trial at the same time also would have been inadmissible, it was anomalous that such conduct should have become an important part of this litigation.  Introduction of evidence of other criminal conduct to establish bad character of a *co-defendant* is barred unless the prior criminal activity is "an essential element of the charge against accused."  22A *C.J.S. Criminal Law, supra,* § 681 (citing *Costello v. United States,* 255 *F.*2d 389 (8th Cir.), *cert. den.,* 358 *U.S.* 830, 79 *S.Ct.* 527, 3 *L.Ed.*2d 69 (1958) (evidence that defendant knew that co-defendant was a convicted felon admissible since relevant to offense of furnishing firearms to previously-convicted felon)); *see also State v. Coruzzi,* 189 *N.J.Super.* 273, 305–06 (App.Div.) (evidence of prior conduct used to attack credibility not excluded by *Evid.R.* 22(d) and *Evid.R.* 47), *certif. den.,* 94 *N.J.* 531 (1983).  But here the sole purpose of the evidence of other criminal acts of the principal was to test the credibility of the accused.

Obviously, under Evidence Rule 4, a sound measure of discretion to gauge whether the "probative value [of such evidence] is substantially outweighed by the risk * * * of undue prejudice" must be reposed in the trial court.  It would strain credulity to believe that a jury should not be permitted to test a defendant's

claim of lack of knowledge of criminal purpose on the part of a passenger who was known to have made a specialty of committing store heists. Hence our concern here is not with the basic admissibility of such evidence but with the degree of its admissibility.

The degree to which the topic of Godfrey's indictment for bank robbery had infected Weeks' trial is evident by the prosecutor's statement during the closing argument:

> We don't have to prove who the man was who did the actual robbery. He is not on trial here.
>
> I guess the defendant wants it to be Godfrey. However, *we have to prove that a bank robbery occurred;* that somebody went in and held up that store and that the defendant was the driver of the getaway car, the lookout, the person who aided and abetted, the person who was an accomplice. (Emphasis added).

The combination of the erroneous instruction by the court, the unintended homogenization of the bank robbery and the store holdup, and the prosecutor's own statement to the jury that all he had to do was prove that "somebody went in and held up that store and that the defendant was the driver of the getaway car" in order to convict defendant as an accomplice to armed robbery, lead to the conclusion that reversal is required.

We intend no criticism of the court or counsel on this score. As noted, this case was tried soon after the Graves Act was adopted and before *State v. White, supra,* 98 *N.J.* 122. In their charge conference, the parties were focusing on another aspect of the case, namely whether the State had to prove that Godfrey was the one who had committed the robbery. Hence, the emphasis by the State that all that it had to prove was that "a robbery occurred" and "defendant was the driver." The court was requested to and did charge the jury that "the State is not required to prove that Anthony Godfrey was the person who robbed the bakery. [But] * * * the State does have burdens of proof in this case concerning proving that there was a robbery and proving Mr. Weeks was an aider and abettor." Defense counsel, as well, in addressing the issue of shared

intent had primarily focused on the absence of proof that Godfrey had committed the robbery and the illogic "that a man out on bail on bank robbery is going to pull another stick up in broad daylight at nine, 9:30 in the morning." But in light of *State v. White, supra,* 98 *N.J.* 122, we now see the heightened importance of carefully imparting to the jury the distinctions between the specific intent required for the grades of the offense.

We recognize the ordinary reluctance of reviewing courts to reverse on the grounds of plain error when no objection to a charge has been made. But we have repeatedly emphasized that incorrect instructions of law are poor candidates for rehabilitation under the harmless error theory. *State v. Warren,* 104 *N.J.* 571 (1986); *State v. Crisantos,* 102 *N.J.* 265 (1986). The defendant should be tried with correct instructions on the degree of his liability as an accomplice. We find no error in the trial court's other rulings. On retrial, a reasonable exploration of defendant's knowledge of the co-defendant's prior conduct should be allowed.

For the reasons stated, the judgment of the Appellate Division is reversed and the cause remanded.