**RECORD IMPOUNDED**

NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NOS. A-4250-16T4
A-5060-16T4

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

RAQUEL RAMIREZ,

    Defendant-Appellant.

_____

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

JORGE OROZCO,

    Defendant-Appellant.

_____

> **APPROVED FOR PUBLICATION**
>
> **December 12, 2019**
>
> **APPELLATE DIVISION**

    Argued October 29, 2019 – Decided December 12, 2019

    Before Judges Messano, Vernoia and Susswein.

    On appeal from the Superior Court of New Jersey, Law Division, Union County, Indictment No. 14-07-0599.

    Alyssa A. Aiello, Assistant Deputy Public Defender, argued the cause for appellant Raquel Ramirez

(Joseph E. Krakora, Public Defender, attorney; Alyssa A. Aiello, of counsel and on the brief).

Amira R. Scurato, Designated Counsel, argued the cause for appellant Jorge Orozco (Joseph E. Krakora, Public Defender, attorney; Amira R. Scurato, on the brief).

Sarah C. Hunt, Deputy Attorney General, argued the cause for respondent (Gurbir S. Grewal, Attorney General, attorney; Sarah Lichter, Deputy Attorney General, of counsel and on the briefs).

The opinion of the court was delivered by

MESSANO, P.J.A.D.

Defendants Raquel Ramirez and Jorge Orozco were the parents of two-year-old, D.O. (Danielle), who died as a result of blunt force trauma to her head.[1] Both defendants were charged with Danielle's murder and second-degree endangering the welfare of a child, N.J.S.A. 2C:24-4(a)(2), and were tried together by a jury. The jurors acquitted both defendants of murder, but found Orozco guilty of the lesser-included offense of first-degree aggravated manslaughter, N.J.S.A. 2C:11-4(a)(1) and (c), Ramirez guilty of the lesser-included offense of second-degree reckless manslaughter, N.J.S.A. 2C:11-4(b)(1) and (c), and both defendants guilty of endangering.

---

[1] We choose to utilize initials and a pseudonym for the minor victim and other family members and lay witnesses. R. 1:38-3(c)(9), (d)(12).

The judge sentenced Orozco to a twenty-eight-year term of imprisonment subject to an eighty-five percent period of parole ineligibility pursuant to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2, on the aggravated manslaughter conviction, and a consecutive nine-year term with a fifty-four-month parole disqualifier on the endangering conviction. He sentenced Ramirez to an eight-year term of imprisonment on the manslaughter conviction, subject to NERA, and a consecutive eight-year term with a forty-eight-month parole disqualifier on the endangering conviction. These appeals, which we consolidated for purposes of issuing a single opinion, ensued.

Ramirez raises the following points for our consideration:

> POINT I
>
> THE ACCOMPLICE CHARGE FAILED TO INSTRUCT THE JURY THAT RAMIREZ WAS NOT GUILTY OF RECKLESS MANSLAUGHTER BY OMISSION UNLESS IT WAS HER CONSCIOUS OBJECT TO FACILITATE OR PROMOTE THE ABUSE THAT RESULTED IN DEATH AND, INSTEAD, ERRONEOUSLY PERMITTED THE JURY TO CONVICT RAMIREZ IF SHE WAS (sic) MERELY "AWARE" OF THE ABUSE AND DID NOTHING TO STOP IT.
>
> POINT II
>
> THE TRIAL COURT ERRED IN DENYING DEFENDANT'S APPLICATION FOR MERGER. IN THE ALTERNATIVE, THE TRIAL COURT ERRED IN IMPOSING CONSECUTIVE SENTENCES.

3

Orozco raises these points on appeal:

POINT I

THE TRIAL COURT ERRED IN FINDING DEFENDANT'S STATEMENTS GIVEN TO POLICE WERE NOT IN VIOLATION OF HIS MIRANDA[2] RIGHTS.

POINT II

THE TRIAL JUDGE ERRED IN FAILING TO EXCLUDE THE DISCREDITED SCIENCE OF BITE MARK EVIDENCE.  (Not Raised Below)

POINT III

THE TRIAL COURT ERRED IN FAILING TO SEVER THE TRIALS OF THE CO-DEFENDANTS DUE TO THE ANTAGONISTIC DEFENSES THAT DEVELOPED BETWEEN THEM DURING TRIAL. (Not Raised Below)

POINT IV

THE CONCEPTS OF PRINCIPAL VERSUS ACCOMPLICE LIABILITY WERE FLAWED BOTH IN THE JURY INSTRUCTIONS AND IN THE FAILURE TO SEVER, RESULTING IN COMPROMISING FACTS.

POINT V

SENTENCING ABNORMALITIES EXISTED INCLUDING THE FINDING OF AGGRAVATING FACTOR [TWO] AS WELL AS THE IMPOSITION OF A CONSECUTIVE SENTENCE.

---

[2]  Miranda v. Arizona, 384 U.S. 436 (1966).

4

We begin consideration of these arguments by summarizing the trial evidence.

I.

On the day of her death, Sunday, February 2, 2014, Danielle was living with Orozco in an apartment near his mother, E.N. (Eva). Eva cared for Danielle on Mondays, Wednesdays and Fridays, from 6 a.m. to noon or 1 p.m., while Orozco was at work.[3] Eva testified that she last saw Danielle alive on the previous Friday, when she babysat, and that Danielle was fine, except for a faint bruise near her eye. Another witness, T.G., saw Danielle one week earlier, on January 24 and 25, and testified the child was healthy and appeared normal in every way.

At about 8 p.m. on February 2, police were dispatched to Orozco's apartment in response to a 9-1-1 call made by Orozco's sister, who had been summoned to Eva's home and learned of Danielle's death. Both defendants were present in Orozco's apartment when police arrived. Danielle lay lifeless on the bed, with evidence that she had recently vomited. The child had numerous bruises and bite marks on her body, gashes on her lips, and other

---

[3] Although not shared with the jury, the Division of Child Protection and Permanency (DCPP) was involved with the family, and Orozco had temporary custody of the child. Ramirez had given birth to another child two weeks earlier, who was in Eva's temporary custody. Orozco's brief claims that DCPP limited Ramirez to supervised visitation with Danielle, although we cannot confirm that from the appellate record.

signs of injury. EMTs who responded were unable to revive Danielle, observed she was cold to the touch with signs of lividity, and concluded she was dead. The medical examiner (ME) arrived shortly before 11 p.m. He determined from the description of Danielle's body when EMTs arrived that she died at least four-to-six hours earlier, around 3 p.m.

The autopsy revealed Danielle had suffered six cracked ribs, bruised lungs, tears to her kidney and spleen, diffuse bruising beneath her scalp, and hemorrhages on both sides of her brain. The ME found a total of four bite marks on her face, lower abdomen, back, and right arm; one mark was as fresh at four hours prior to death, and another was likely inflicted "when [Danielle] almost was dead or had just died." A forensic odontologist testified that the bite marks matched Orozco's dentition.

The ME opined at trial that Danielle's head injury was not caused by a fall or from being shaken, and that it occurred "less than [twelve] hours" before she died. He explained that a person could suffer severe head trauma that was not instantly fatal, but rather could die after suffering a "re-bleed" because of the brain's compromised condition. During this time, vomiting, lethargy and trouble breathing are common.

Police interviewed each defendant several times, and the redacted, video-recorded statements were played for the jury. Throughout, both

attributed Danielle's injuries to falls, rough play, or uncorroborated physical defects in her feet and legs. Both also claimed that Danielle's stomach would swell when she ate, and that she had a history of vomiting after a meal. However, neither ever took Danielle to get medical treatment.

As to the events of February 2, defendants' statements regarding the first half of the day were generally consistent. Both said they spent the morning together with Danielle at Orozco's apartment and that at mid-morning, Ramirez left Orozco alone with Danielle while she went to a laundromat. They gave shifting and confusing accounts about what occurred when Ramirez returned.

Ramirez gave police statements on February 3 at 4:26 a.m., 9:37 a.m. and 7:19 p.m. During the first, she said that when she returned to Orozco's apartment, she bathed Danielle, and defendants took turns feeding the child. Soon thereafter, Orozco left the apartment to buy food. Ramirez noticed that Danielle appeared drowsy, and so she laid the child down to sleep on the sofa in the living room. Danielle was having difficulty breathing, began "snoring," and suddenly vomited profusely. The child abruptly stopped breathing and became "stiff."

Because the sofa was covered in vomit, Ramirez took Danielle into the bedroom and changed her clothes. When police later asked about Danielle's soiled clothes, Ramirez said that Danielle was still undressed because she had

just finished her bath. Once she realized that Danielle was dead, Ramirez became distraught, and, instead of calling police, she called Eva and Orozco at around 6:30 or 7 p.m. When she eventually got in touch with Orozco, he returned home, and they called for medical assistance.

Ramirez admitted that while bathing Danielle, she noticed bruises on the child's body but claimed she did not know the cause. When police confronted Ramirez with pictures of the bite marks on Danielle's stomach, defendant said they resulted from her "kisses." In her second interview, Ramirez said the marks on Danielle's stomach were "suck marks," and the bruises were the results of falls. During her third interview, Ramirez claimed that she did not know the source of Danielle's injuries because she had just given birth to her new baby and was in the hospital.

Orozco provided statements to investigators on February 3, February 4, and February 27. According to his first account, Orozco said he left the apartment around 12:30 p.m., after Ramirez returned from the laundromat. He went to his friend's home, called Ramirez for reasons that are unclear, but she did not answer, and he went to store to pick up food, before returning around 6:20 p.m. He found Danielle alone in the apartment. Her body appeared to have been "thrown" on the bed, and she had no pulse. Orozco tried

8

administering CPR, but he could not revive her and went to Eva's home where he found Ramirez. When his sister arrived, they called 9-1-1.

He told police that Danielle had bruises on her body and face because she frequently fell and suggested that the bruises on her stomach were from his attempts to administer CPR. During his second interview, Orozco admitted that he would sometimes "tap" Danielle on the back of her head to get her attention, and that he "sucked" on her cheek. He bathed Danielle daily, but never noticed any of the injuries on Danielle's body.

Orozco provided contradictory answers regarding his communications with Ramirez on the day Danielle died. For example, in one interview, he told police that he left at around 12:30 p.m. to get food, but in another he said that he left at around 2:30 p.m. Phone records showed that beginning at 2:57 p.m., Ramirez called Orozco multiple times within a five-to-six-minute span, culminating in a forty-minute conversation between the two beginning at 3:05 p.m.

Neither defendant testified nor produced any witnesses.

In summation, Orozco's counsel argued that Danielle died while in Ramirez's custody alone, and that Ramirez failed to call 9-1-1. He noted that Ramirez was arrested shortly after providing a statement to police, but that Orozco voluntarily presented himself for police questioning the next day,

demonstrating he had nothing to do with the child's death. Counsel downplayed the presence of bite marks on Danielle's body, noting they were not fatal injuries. In short, Orozco blamed Ramirez for inflicting the injuries that killed Danielle.

Citing the ME's testimony regarding a later possible re-bleed after head trauma, and the forensic evidence regarding the bite marks, Ramirez's counsel argued in summation that Danielle's injuries were suffered prior to the weekend, while she was in Orozco's care. He noted that Eva saw a bruise near Danielle's eye on Friday, which Orozco told her was caused by a fall. Counsel noted that Ramirez's account of Danielle's final moments was consistent with the ME's testimony about symptoms of prior head trauma suffered days earlier. Defense counsel further argued that Orozco "inexplicably" departed from the apartment around 2:30 p.m., his failure to answer Ramirez's repeated phone calls around 3 p.m., and the forty-minute conversation that followed without Orozco's immediate return to the apartment, proved that Orozco knew Danielle was in extremis when he left and was trying to "distance himself" from the situation. In short, Ramirez's counsel contended Danielle's death was Orozco's fault, and the State failed to prove Ramirez did anything to cause her death or that she had "some role with the intent . . . to cause serious injury or . . . death to [Danielle]."

A-4250-16T4

The prosecution's theory was that both defendants participated in causing the plethora of injuries Danielle suffered during an approximately forty-eight-hour period, between Friday afternoon, when the child left Eva's watch, and Sunday afternoon, before police were summoned. The prosecutor noted defendants' multiple phone conversations, and their failure to call 9-1-1 or summon medical help for the child. In summation, he argued defendants knew Danielle was dead, and their communications and delay demonstrated a consciousness of guilt as they tried to coordinate their stories. However, the prosecutor argued defendants' attempts ultimately failed, as their stories diverged with each telling and as the forensic evidence and phone records emerged.

The prosecutor then attempted to display a slide for the jury that contained the "elements of accomplice liability." Defense counsel objected, arguing that instructing the jury on the applicable law was the judge's "province." The judge asked if the slide and others that were to follow were provided to defense counsel, and, when the prosecutor indicated they had not, the judge precluded their use. He immediately told the jury they must follow his instructions on the law, not what the attorneys said.

11

Resuming his discussion without the benefit of visual aids, the prosecutor discussed a "special way . . . for parents" to be accomplices, explaining "the law imposes a duty to actually act, and it's only on parents[.]"

> So when the parent sees someone beating their child to death, that parent has an obligation to try to stop it. And by knowingly doing nothing, you are now sharing the same intent as the person who's killing and trying to cause serious bodily injury resulting in death. By you doing nothing, you're helping him commit murder. . . . The important part is that this happened when . . . defendants were together. The beating happened in front of one of them and the person who was not beating [Danielle] did nothing to stop the beating. And <u>if you do nothing as a parent to stop your child from being beat to death, you are guilty of murder as well</u>. That's the accomplice liability theory in this case. As a parent[,] even if you believe that [Ramirez] had nothing to do with it, didn't lay a hand on . . . [Danielle], but if you believe that she was present during the beatings that occurred that weekend — they're all together <u>and she knowingly did nothing to stop it, she's guilty as well of murder.</u>

> [(Emphasis added).]

He completed his summation shortly thereafter.

In addition to instructing the jury on the elements of endangering, the judge provided substantive instructions on murder, aggravated manslaughter, reckless manslaughter, aggravated assault (serious and significant bodily injury), and simple assault, along with instructions on accomplice liability as

to each of those offenses. Jurors were dismissed for the day following the charge.

The jury began deliberations the next morning with two written copies of the voluminous instructions for their use. Jurors posed a single question during deliberations, which is insignificant to the issues presented, and returned the verdicts we referenced above late in the afternoon.

## II.

Both defendants argue the jury instructions on accomplice liability were erroneous and require reversal. Before turning to the context in which the issue arose at trial, we discuss our decision in State v. Bass, 221 N.J. Super. 466 (App. Div. 1987), which became a critical focal point in the proceedings.

In Bass, the defendants were charged with murdering their three-year-old son, Shawn, who died from a brutal beating. Id. at 471. At their joint trial, another child testified to a specific prior assault of Shawn by the defendant-father, Bass. However, much of the evidence showed he was not cruel or abusive, whereas the child's mother, the defendant Nicely, regularly abused the child. Id. at 471–72. Bass was acquitted of murder, but convicted of aggravated manslaughter. Id. at 470.[4]

---

[4] Nicely was convicted of murder and other charges. Bass, 221 N.J. Super. at 471 n.3.

Among other issues raised on appeal, Bass challenged the trial judge's instructions on accomplice liability, contending the judge "failed to charge that [a] defendant must share a community of purpose for accomplice liability[.]" Id. at 486. In rejecting the argument, we began by noting that "[a] shared intent is a prerequisite to accomplice liability under N.J.S.A. 2C:2-6(b)(3)." Ibid. (citing State v. White, 98 N.J. 122, 129 (1984); State v. Fair, 45 N.J. 77, 95 (1965)). We then cited with approval the trial judge's charge on accomplice liability when the actor aids or agrees or attempts to aid another in the planning or commission of a crime. Id. at 487; see N.J.S.A. 2C:2-6(c)(1)(b).

We next addressed defendant's argument

> that the trial judge instructed the jury that if a defendant purposely did nothing to stop the other from beating the decedent, his inaction alone was sufficient to constitute culpability for murder or aggravated manslaughter. He contends the court never addressed the jury regarding the requirement of shared intent with the actual perpetrator. According to defendant, the judge informed the jury that purposely "doing nothing," without more, was sufficient for a finding of guilt of murder or aggravated manslaughter.
>
> [Id. at 488.]

We quoted extensively from the judge's charge.

> As to omission to act, the trial judge charged the jury as follows:

> Ladies and gentlemen, I also instruct you that if only one person committed the acts causing Shawn's death, the other can be deemed an accomplice to murder if you find that he or she <u>was a natural parent or person having custody or control of the child or who otherwise assumed responsibility for him and that he or she purposely did nothing to stop the beating and did nothing with purpose or knowledge that the beatings by the other would result in Shawn's death or in serious bodily injury resulting in death</u>.

[<u>Ibid.</u>]

Without much further discussion or analysis of these instructions, and based on a review of the charge in its entirety, we said the defendant's argument as to the inadequacy of the charge lacked any merit. <u>Id.</u> at 490.

## A.

Here, at the close of the State's case, both defendants moved for a judgment of acquittal. Ramirez argued that the evidence was insufficient to demonstrate she inflicted any blows to Danielle, and, under <u>Bass</u>, that she had any "knowledge" Orozco inflicted "the head injury which was likely to cause serious bodily injury or death." Orozco's attorney joined in the argument as to his client. The prosecutor contended there was sufficient circumstantial evidence to convict both defendants. In denying the motion, the judge concluded,

> whether it's as a principal or accomplice, accomplice based on shared intent, <u>or</u> accomplice based upon <u>Bass</u>, the evidence with regard to guilt is more than sufficient for the defendants to be convicted of murder, and . . . all of the lesser[-]included offenses to murder are in play . . . <u>as are any accomplice theories that are based on something other than shared intent.</u>

At the charge conference later that day, the judge again requested argument regarding <u>Bass</u> and the proposed jury charge, including the State's contention that the jury should be permitted to return a "split verdict," i.e., a non-unanimous verdict with some jurors finding a particular defendant guilty as a principal and others as an accomplice.

Defendants objected to the charge by seeking to distinguish or limit the applicability of <u>Bass</u>. As counsel for Ramirez stated during the charge conference, the instruction "ha[d] the capacity of resulting in a murder conviction for someone who . . . does not have the same intent or purpose as the person who . . . is the principal." The prosecutor argued only that <u>Bass</u> controlled.

However, the judge astutely recognized that N.J.S.A. 2C:2-6(c)(1)(c) (subsection 1(c)) was only one of three sub-sections of the Criminal Code that defined who could be an "accomplice," and that under the plain language of the statute, every type of accomplice was "required to have the purpose of promoting or facilitating the commission of the offense." (citing N.J.S.A.

2C:2-6(c)(1)). He asked for the prosecutor's "thoughts on the statutory construction argument[.]" Without directly addressing the judge's inquiry, the prosecutor responded, "[T]his third theory of liability [under subsection 1(c)] is different than the ordinary accomplice theory. It imposes in very limited circumstances under the law that someone must act, and failure to do so is in essence facilitating that act." (emphasis added).

In a considered oral decision, the judge concluded that despite "some issues and concerns that are legitimate with the Bass case[,]" it was still good law, and he would provide a charge in accordance with his understanding of its holding. But, he also decided "to deny the State's request to instruct the jury that they do not have to agree unanimously on guilt under Bass for a particular crime[.]" Noting Bass's recognition that a prerequisite of accomplice liability was shared intent, 221 N.J. Super. at 486, the judge stated that Bass did not "bless[] a jury returning a verdict for accomplice liability based on a parental duty theory without that result being unanimous."

As further justification, the judge referenced the model jury charge's instruction that the jury must find "this defendant's purpose was to promote or facilitate the commission of the offense[.]" Model Jury Charges (Criminal), "Liability for Another's Conduct (N.J.S.A. 2C:2-6)" (rev. June 18, 2011) (the

17

Model Charge).  The judge noted that this provision and others in the Model

Charge stood

> in stark contrast to what needs to be shown for liability under Bass . . . .  Bass liability appears to be available upon a much less significant showing.  In particular, it's essentially two elements. With regard to the defendant, he or she is a natural parent . . . .  And, [two], that he or she was aware of and purposely did nothing to stop the alleged abuse and did nothing with purpose or knowledge that the alleged abuse . . . would result in death or serious bodily injury resulting in death.
>
> That's different than the operative actions that would be necessary for a conviction of murder or accomplice liability based on shared intent.  In Bass you have the real possibility that a defendant can be convicted as an accomplice of murder without striking a blow and without sharing the purposeful intent to kill.
>
> [(Emphasis added).]

The judge provided the parties with a revised proposed charge that apparently

required the jury to be unanimous if it found a defendant guilty as a principal

or unanimous if it found a defendant guilty as an accomplice under subsection

1(c).[5]

The State moved for a stay pending leave to file an interlocutory appeal.

In considering the reasonable success on the merits of the State's position, the

---

[5]  We do not have a copy of the revised proposed charge.

judge reiterated his view of our holding in <u>Bass</u> and why unanimity was required.

> [T]he State's position would mean that you would take an argument . . . you would see in accomplice liability based on shared intent and apply that to an offense centered around an omission. For liability as a princip[al], there must be . . . an affirmative act or intent to forward the endeavor, to advance the endeavor, to aid the endeavor.
>
> Whereas in a <u>Bass</u> offense, there's a failure to act. . . . To put it bluntly, that's not apples to apples when you're comparing affirmative liability as a princip[al] [versus] vicarious liability based on a duty as in <u>Bass</u>.
>
> I think because the actus reus, and, arguably, the mens rea is different between the affirmative acts of princip[al] and accomplice based on shared intent and liability based on duty[,] it necessitates and requires that . . . all the jurors find all the elements of the <u>Bass</u> offense have been proven beyond a reasonable doubt by the State.

We granted the State's motion for leave to appeal on an emergent basis and reversed. Our first order simply required that the judge charge the jury in accordance with <u>Bass</u> and <u>State v. Roach</u>, 146 N.J. 208 (1996). The trial judge sought clarification, and we issued a second order specifically addressing the acceptability of a non-unanimous verdict, citing again <u>Roach</u>, <u>id.</u> at 223 ("A defendant, moreover, may be found guilty of murder even if jurors cannot

19

agree on whether the defendant is a principal, accomplice, or a co-conspirator.") (citing State v. Brown, 138 N.J. 481, 520–522 (1994)).

As a result, after charging the jury as to the substantive elements of murder and the lesser-included offenses, the judge provided the jury with instruction as to "each defendant's liability under the theory of accomplice liability."  The judge defined an "accomplice" as one who

> for the purpose of promoting or facilitating the commission of the offense . . . aids or agrees or attempts to aid such other person in planning or committing it, or, having a legal duty to prevent the commission of the offense[,] he or she fails to make a proper effort to do so.

The judge then told the jurors there were "three theories of accomplice liability" to consider, the first being

> a duty each defendant owed to [Danielle] as a parent. The second . . . based upon each defendant's alleged conduct . . . requiring shared intent; and the third . . . based upon each defendant's conduct . . . who did not share the same intent as the principal and is therefore responsible for a lesser[-]included offense.

Then, beginning with murder, the judge told the jury that if it found only one defendant committed the acts that caused Danielle's death, the other defendant could be guilty of murder as an accomplice if "he or she was aware of and purposely did nothing to stop the alleged abuse and did nothing with purpose or knowledge that the alleged abuse by the other would result in death

or serious bodily injury resulting in death." In charging on the lesser-included offenses, the judge essentially repeated this instruction, for example, telling the jury that to find a defendant guilty under subsection 1(c) as an accomplice to aggravated manslaughter, it must find "that he or she was aware of and recklessly did nothing to stop the alleged abuse and did nothing under circumstances manifesting extreme indifference to human life[,]" and as to reckless manslaughter, if it found a defendant "was aware of and recklessly did nothing to stop the alleged abuse and did nothing despite being aware of and consciously disregarding the risk of causing death." As to each offense, the judge did not tell the jury that a defendant could be liable as an accomplice under subsection 1(c) only if the failure to act was for the "purpose of promoting or facilitating the commission of the offense[.]" See N.J.S.A. 2C:2-6(c)(1).

The judge then instructed the jury on accomplice liability "based on shared intent between the defendants." He essentially provided instructions that tracked the Model Charge, advising jurors that a defendant could be an accomplice if his or her "purpose was to promote or facilitate the commission of the crime," and if the "accomplice possessed the same criminal state of mind that is required to be proved against the person who actually committed the criminal act." Before concluding this portion of the instructions, the judge

21                                                                    A-4250-16T4

reiterated that in order to find a defendant guilty as an accomplice under this portion of the Criminal Code, the jury

> must find that the accomplice . . . had the purpose to participate in that particular crime. He or she must act with the purpose of promoting or facilitating the commission of the substantive crime with which he is charged.
>
> It is not sufficient to prove only that the accomplice defendant had knowledge that another person was going to commit the crime charged. The State must prove that it was the accomplice defendant's conscious object that the specific conduct charged be committed.

Lastly, the judge charged the jury regarding the possibility of accomplice liability as to lesser-included offenses if the principal and accomplice did not have "the same shared intent[.]"

### B.

Ramirez argues these instructions require reversal because they permitted the jury to return a guilty verdict as to manslaughter even if she lacked the purpose of promoting or facilitating the offense. She contends that the State and the judge proceeded on the basis that Bass provided a separate theory of accomplice liability that did not require proof her conscious object was to promote or facilitate the crime. Orozco argues that Bass is "outdated," and its discussion and approval of the judge's charge in that case is "dicta."

22

The State counters by arguing defendants failed to object to the charge, and there was no plain error because the instructions conveyed that accomplice liability under subsection 1(c) requires the State prove a defendant acted with the purpose to promote or facilitate an offense by failing to act. It claims that neither the prosecutor nor the judge viewed subsection 1(c) as a different species of accomplice liability that relieved the State of its obligation to prove either defendant's failure to act was with a purpose to promote or facilitate the crime.

Initially, the record is quite clear that defendants repeatedly objected to the charge, albeit not precisely on the grounds now enunciated. Ramirez's counsel in particular argued the charge was "confusing" and "ha[d] the capacity of resulting in a murder conviction for someone who . . . does not have the same intent or purpose as the person who . . . is the principal." We therefore reject the State's argument that plain error review is required and consider whether, viewing the charge in its entirety, State v. McKinney, 223 N.J. 475, 494 (2015), any error was harmless, State v. Baum, 224 N.J. 147, 159 (2016) (noting harmless error analysis is proper when defendant objects to the charge).

Under our Criminal Code, "[a] person is guilty of an offense if it is committed by his own conduct or by the conduct of another person for which

he is legally accountable, or both." N.J.S.A. 2C:2-6(a). A person may be legally accountable for another's conduct if "[h]e is an accomplice of such other person in the commission of an offense[.]" N.J.S.A. 2C:2-6(b)(3). The Code defines who is an accomplice:

> A person is an accomplice of another person in the commission of an offense if:
>
> (1) With the purpose of promoting or facilitating the commission of the offense; he
>
>> (a) Solicits such other person to commit it;
>>
>> (b) Aids or agrees or attempts to aid such other person in planning or committing it; or
>>
>> (c) Having a legal duty to prevent the commission of the offense, fails to make proper effort so to do; . . . [.]
>
> [N.J.S.A. 2C:2-6(c)(1) (emphasis added).][6]

As the Court has explained

> A defendant is responsible as an accomplice for a crime committed by another if he or she, intending to facilitate the crime, either solicits the other person to commit it, aids the person committing it, or does not prevent the crime, notwithstanding the fact that he or she has an obligation to do so.

_____

[6] A person may also be an accomplice if "[h]is conduct is expressly declared by law to establish his complicity." N.J.S.A. 2C:2-6(c)(2). This subsection is irrelevant to the issues posed on appeal.

> [In re State ex rel. A.D., 212 N.J. 200, 221 (2012) (citing N.J.S.A. 2C:2-6(b)(3); N.J.S.A. 2C:6(c)(1)) (emphasis added).]

"By definition an accomplice must be a person who acts with the purpose of promoting or facilitating the commission of the substantive offense for which he is charged as an accomplice." White, 98 N.J. at 129.

> The use of the word [purpose] in the statute evidences a careful legislative judgment, concerning the degree of an accomplice liability, arrived at after extended debate. The drafters of the Model Penal Code (MPC) originally presented a tentative formulation of accomplice liability premised on the culpable mental state of knowledge as the sufficient predicate for establishing the liability of the accessory. This tentative formulation was rejected, and the MPC now specifically requires that the accomplice have the "purpose of promoting or facilitating the commission of the offense" of which the principal was convicted.
>
> [State v. Weeks, 107 N.J. 396, 402 (1987) (citing Model Penal Code and Commentaries (Official Draft and Revised Comments) § 2.06(3)(a) (1985) (internal citations omitted)).]

Thus, to be guilty as an accomplice, the jury must "find that the defendant had the purpose to participate in the crime [as] defined in the Code[.]" Id. at 403; see also Cannel, N.J. Criminal Code Annotated, cmt. 7 on N.J.S.A. 2C:2-6 (2019) (collecting cases and noting that "for accomplice liability to attach[,] the defendant must have a purpose that someone else engage in the conduct that constitutes the particular crime charged").

To be guilty of the same crime as his or her principal, the accomplice must also share the same culpable mental state as that which is an element of the crime, although "an accomplice who does not share the same intent or purpose as the principal may be guilty of a lesser or different crime than the principal." A.D., 212 N.J. at 222 (quoting State v. Whitaker, 200 N.J. 444, 458 (2009)); see also State v. Hill, 199 N.J. 545, 567 (2009) (citing White, 98 N.J. at 129) ("[A]ll participants in the crime may be guilty, but not necessarily of the same degree.").

Writing for our court in State v. Bridges, and addressing the Criminal Code's vicarious liability provisions for co-conspirators and accomplices, Judge Pressler considered the "apparent conundrum" as to whether an actor "can intend a reckless act[,]" 254 N.J. Super. 541, 563 (App. Div. 1992), affirmed in part and reversed in part, 133 N.J. 447 (1993). Judge Pressler explained:

> If the actor is liable for a "reckless" crime, vicarious liability for that crime or a lesser-included "reckless" crime may attach to an accomplice or conspirator who purposely promoted or facilitated the actor's conduct; who was aware when he did so, considering the circumstances then known to him, that the criminal result was a substantial and justifiable risk of that conduct; and who nevertheless promoted that conduct in conscious disregard of that risk. . . . Vicarious liability for a "reckless" crime may also, however, attach when the actor commits an "intent" crime and the accomplice or conspirator did not intend

26

that that crime be committed but nevertheless intended that the actor take a specific action or actions which resulted in the crime. If criminal liability for the criminal result of that conduct can be predicated on a reckless state of mind, an accomplice or co-conspirator can be vicariously liable for that "reckless" crime under the same principles which apply where the actor's culpability is also based on recklessness. This is so even if the actor himself is guilty of an "intent" crime.

[Id. at 566 (emphasis added).]

As Judge Skillman later recognized in State v. Bielkiewicz, "[a]lthough the Supreme Court disagreed with our conclusion [in Bridges] that the liability of an alleged co-conspirator is governed by these same principles, it did not disagree with our discussion of accomplice liability as applied to murder and the lesser[-]included offenses of aggravated manslaughter and manslaughter." 267 N.J. Super. 520, 529–30 (App. Div. 1993) (citation omitted).

The Model Charge on accomplice liability expressly tells the jury that an accomplice may be guilty of a lesser crime than his principal. Model Charge at 1, n.1 (citing Bielkiewicz, 267 N.J. Super. at 533). However, the Model Charge only addresses accomplice liability when the actor "solicits" or "aids or agrees or attempts to aid" in the crime's planning or commission. N.J.S.A. 2C:2-6(c)(1)(a) and (b); see Model Charge at 1. The Model Charge does not provide instructions when a defendant is charged as, or the State contends he or she is, an accomplice under subsection 1(c), i.e., because he or she has "a

legal duty to prevent the commission of the offense, [and] fails to make proper effort so to do[.]"  N.J.S.A. 2C:2-6(c)(1)(c).

Liability under the Criminal Code is generally premised upon a "voluntary act[,]"and "[l]iability for the commission of an offense may not be based on an omission unaccompanied by action unless:  (1) [t]he omission is expressly made sufficient by the law defining the offense; or (2) [a] duty to perform the omitted act is otherwise imposed by law . . . ."  N.J.S.A. 2C:2-1(a), (b)(1), (2).  Subsection 1(c) recognizes this latter exception.

The accomplice provisions of our Criminal Code, N.J.S.A. 2-6(c)(1)(a)-(c), are identical to MPC § 206(3).  Cannel, New Jersey Criminal Code Annotated, cmt. 1 on N.J.S.A. 2C:2-6 (2019).  And, while many states have adopted the MPC in some form or another, very few have adopted the equivalent of subsection 1(c).[7]  In those states that have, our research reveals no published opinion that specifically addresses accomplice liability based on

---

[7]  Our research reveals that nine other states have adopted provisions for accomplice liability similar to subsection 1(c).  In each instance, for vicarious criminal liability to attach, the actor's failure to perform a legal duty must be accompanied by a purpose or intent to commit, promote or facilitate the commission of the offense.  See Ala. Code § 13A-2-23(3) (1975); Ark. Code Ann. § 5-2-403 (1975); Del. Code Ann. tit. II § 271(2)(c) (1953); Haw. Rev. Stat. §702-222(1)(c) (1972); Ky. Rev. Stat. Ann. § 502.020(2)(c) (LexisNexis 1974); N.D. Cent. Code § 12.1-03-01(1)(b) (1973); Or. Rev. Stat. § 161.155(2)(c) (1971); Tenn. Code Ann. § 39-11-402(3) (1989); Tex. Code Ann. § 7.02(a)(3) (1973).

the failure to perform a legal duty. The only reported case in New Jersey that addresses accomplice liability under subsection 1(c) is Bass.

To the extent our decision there implied the State need not prove the accomplice's purposeful intent, we expressly disapprove of Bass. We hold that like other provisions of the Criminal Code defining accomplice liability, accomplice liability under subsection 1(c) is predicated on a finding beyond a reasonable doubt that the defendant's failure to act was accompanied by a purpose to promote or facilitate the commission of the offense.

We reach this conclusion for several reasons. Initially, as the trial judge noted, the plain language of N.J.S.A. 2C:2-6(c) requires that to be vicariously liable as an accomplice for another's commission of a crime, one must act or fail to act "[w]ith the purpose of promoting or facilitating the commission of the offense[.]" Accord White, 98 N.J. at 129 (first alteration in original). The Legislature's intent is clear and unambiguous. See State v. Munafo, 222 N.J. 480, 488 (2015) (holding that we give effect to the Legislature's intent by first examining the "plain language of the statute") (citations omitted).

Indeed, the legislative decision to require such a high threshold before imposing vicarious criminal liability for complicity in a crime — proof of purpose — was no accident, as demonstrated by the commentaries that presaged enactment of our Criminal Code. "The Code limits the scope of

liability to crimes which the accomplice had the purpose of promoting or facilitating.  It is intended not to include those which he merely knowingly facilitated substantially.  We agree with the MPC in this regard."   II The New Jersey Penal Code:  Final Report of the New Jersey Criminal Law Revision Commission 58 (1971) (emphasis added); Weeks, 107 N.J. at 403.  Addressing the three subsections of N.J.S.A. 2C:2-6(c)(1), the commentators explained:

> The Code includes . . . not only those who command, request, encourage, provoke or aid[,] but also those who agree or attempt to aid in the planning or execution.  It also includes one who has a legal duty to prevent the crime who fails to make proper effort to do so.  This represents an exhaustive description of the ways in which one may purposely enhance the probability that another will committee a crime. There being a purpose (i.e., a "specific intent") to further or facilitate, there is no risk of innocence.
>
> [II The New Jersey Penal Code:  Final Report of the New Jersey Criminal Law Revision Commission 59 (1971) (emphasis added).]

The commentaries to the MPC reiterate the requirement that to be culpable as an accomplice, the actor must "have a purpose to promote or facilitate the offense in question." Model Penal Code and Commentaries (Official Draft and Revised Comments) §2.06 314 (1985).  The commentators specifically explained the rejection of a lesser standard, i.e., that one could be culpable as an accomplice if, "with knowledge that another was committing or had the purpose of committing an offense, [he] knowingly facilitated its

commission." Ibid. Instead, the MPC as adopted reflects "a general principle . . . pointed toward a narrow formulation in order not to include situations where liability was inappropriate. Id. at 318. The commentaries specifically addressed accomplice liability by failure to act, noting "it [was] unduly harsh to view it as participation in the crime[,]" if the actor's "dereliction [was] not purposeful[.]" Id. at 320.

A careful reading of the State's brief makes clear it does not disagree with the proposition that one cannot be criminally liable under subsection 1(c) unless, duty bound, he or she fails to take action with the purpose to promote or facilitate the offense. Instead, the State contends the judge's charge as a whole adequately conveyed this principle, and neither the judge nor the prosecutor suggested subsection 1(c) did not require proof that the accomplice failed to act with the purpose to promote or facilitate the crime. As to this latter point, we cited the colloquy above at length because it specifically demonstrates the opposite.

Indeed, the judge was quite troubled that "Bass liability appears to be available upon a much less significant showing" than other aspects of accomplice liability. He specifically opined that one could be an accomplice under Bass if "he or she [was] a natural parent . . . [a]nd he or she was aware of and purposely did nothing to stop the alleged abuse and did nothing with

31

purpose or knowledge that the alleged abuse would result in death or serious bodily injury resulting in death." This understanding, i.e., that subsection 1(c) expanded accomplice liability when there was no shared intent, led the judge originally to conclude that a specific unanimity charge was required. So, too, the prosecutor's summation comments — telling the jury that defendants' knowledge and purposeful failure to act was legally sufficient to make either an accomplice of the other — were a clear misstatement of the law.

We must consider whether not telling the jury that to be an accomplice under subsection 1(c), a defendant's failure to perform his or her legal duty must be accompanied by a purpose to promote or facilitate the crime was harmful error, i.e., was "of such a nature as to have been clearly capable of producing an unjust result[.]" R. 2:10-2. "The possibility must be real, one sufficient to raise a reasonable doubt as to whether [it] led the jury to a verdict it otherwise might not have reached." Baum, 224 N.J. at 159 (alteration in original) (quoting State v. Lazo, 209 N.J. 9, 26 (2012)).

"Appropriate and proper jury instructions are essential to a fair trial." McKinney, 223 N.J. at 495 (citing State v. Green, 86 N.J. 281, 287 (1981)). As a result, "erroneous instructions on material points are presumed to possess the capacity to unfairly prejudice the defendant." Baum, 224 N.J. at 159 (quoting State v. Bunch, 180 N.J. 534, 542 (2004)). In deciding whether the

32                                                                    A-4250-16T4

error is harmless or not, "[t]he test to be applied . . . is whether the charge as a whole is misleading, or sets forth accurately and fairly the controlling principles of law." Ibid. (quoting State v. Jackmon, 305 N.J. Super. 274, 299 (App. Div. 1997)). "The key to finding harmless error in such cases is the isolated nature of the transgression and the fact that a correct definition of the law on the same charge is found elsewhere in the court's instructions." Ibid. (quoting Jackmon, 305 N.J. Super. at 299). Applying these standards, we are compelled to reverse.

The instructions on accomplice liability began with the definition of an "accomplice" as one who, "for the purpose of promoting or facilitating the commission of the offense . . . aids or agrees or attempts to aid such other person in planning or committing it, or, having a legal duty to prevent the commission of the offense[,] he or she fails to make a proper effort to do so." However, the judge then described subsection 1(c) as one of "three theories" by which one could be an accomplice.

In defining the concept of liability by omission as to murder, aggravated manslaughter, reckless manslaughter, and all lesser-included assaults, the judge did not instruct the jury that the State was required to prove a defendant's failure to act was with a purpose to promote or facilitate the specific crime. The prosecutor's summations comments as to Ramirez

accentuated this error, by telling jurors, "if you believe that she was present during the beatings that occurred that weekend — they're all together and she knowingly did nothing to stop it, she's guilty as well of murder." This is in contrast to the judge's instructions on the other two theories of accomplice liability, in which the jury was repeatedly told that an accomplice must act with the purpose to promote or facilitate the commission of the offense, and that he or she must possess the conscious object to engage in the conduct or cause the result.

The jury should have been clearly instructed that culpability under subsection 1(c) required proof beyond a reasonable doubt that the conscious object of a defendant's failure to prevent the commission of a particular crime was to promote or facilitate the crime. Given the circumstantial nature of the proofs in this case, the failure to provide such an instruction was clearly capable of producing an unjust result.

We therefore reverse defendants' convictions and remand for a new trial. We also commend to the Supreme Court's Committee on Criminal Model Jury Charges consideration of the need for model instructions regarding culpability as an accomplice under subsection 1(c).

III.

34

As to Orozco's other points on appeal, it is clear from the trial record that he never raised a challenge to the admission of his statements to police based on an alleged <u>Miranda</u> violation, never objected to the scientific reliability of the testimony of the State's dental expert, and never moved for a separate trial. On the latter point, Orozco specifically did not join in Ramirez's severance motion, which the trial judge denied. We refuse to consider these contentions presented for the first time on appeal. <u>See</u> <u>State v. Witt</u>, 223 N.J. 409, 419 (2015) (quoting <u>State v. Robinson</u>, 200 N.J. 1, 20 (2009)) ("[W]ith few exceptions, 'our appellate courts will decline to consider questions or issues not properly presented to the trial court when an opportunity for such a presentation is available.'").

In light of our decision, we need not address the sentencing arguments raised by both defendants.

Reversed and remanded for a new trial.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION